## NEWARK FIREPROOFING SASH & DOOR CO., Inc., v. UNITED STATES.

### No. 46097.

Court of Claims.

Jan. 6, 1947.

Prentice E. Edrington, of Washington, D. C., for plaintiff.

Donald B. MacGuineas, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen. (William A. Stern, of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES and MADDEN, Judges.

LITTLETON, Judge.

Shortly prior to November 10, 1943, plaintiff, a manufacturer of sheet metal products, received information from two manufacturers' representatives, who had previously conferred with the Procurement Division of the Maritime Commission, that plaintiff might obtain a contract or purchase order from the Commission for a supply of a certain type of metal blanket container for use on life rafts on merchant

vessels (finding 2). Following this meeting at plaintiff's Newark, New Jersey, office, and after plaintiff had made and delivered to the manufacturers' representatives, for delivery to the Commission, a sample container (without the waterproofing rubber gasket) as representative of the product which plaintiff would undertake to provide and furnish, the plaintiff on November 10, 1943, pepared a sketch (described in findings 11 and 12) explaining the specification of the metal blanket container which it was prepared to manufacture, and sent the same to the Commission at Washington, with the following proposal:

"We hereby submit a rough sketch explaining the specification of the "special metal box," which is to hold two blankets. Production on said box can be started within two days of receiving the materials necessary to manufacture same. The price is as follows:

"24 gauge galvanized iron, soldered on both ends, watertight, in lots of 1,000 to 5,000 $3.60 each. F. O. B. Plant. * * *."

The proof is uncertain as to whether the sample container reached the Commission.

The evidence shows that the phrase "soldered on both ends, watertight" had a special meaning in established usage in the sheet metal trade, which was that the joints between sides, bottom, and ends would be soldered and thereby made watertight. Plaintiff intended this meaning in its proposal and in the sketch attached thereto as a specification, and there is no evidence to show that defendant otherwise understood the use of the phrase mentioned.

Under this specification the removable top of the container, as shown, could not be soldered to the body, or top end, of the container. Therefore the phrase "soldered on both ends, watertight" could not have been interpreted to mean that plaintiff was proposing to furnish a "watertight" metal container. Plaintiff did not expressly propose or represent in its letter or specification that the described container would be "waterproof." Plaintiff's proof is to the effect that it intended by its sketch and proposal that the container would be watertight at the soldered seams and waterproof around the removable top. However, by

the express terms of the contract entered into by the parties on November 29, 1943 (finding 5), pursuant to plaintiff's proposal, plaintiff agreed to furnish "waterproof" containers. The contract, of November 29, called for 1,000 containers at $3.60 each, and on December 14, 1943, the defendant, by written order, increased the quantity to 2,000. So far as material here, the contract provided as follows:

"Containers, blanket, metal, 24 gauge, waterproof, size 10 x 10 x 17, for life rafts, to be painted outside, furnished with lock closures and handle on top, in accordance with rouch sketch furnished with quotation. * . * *

"In accepting this order it is understood that you agree to all the terms and conditions expressly written or referred to herein including General Provisions, Form 4584 which are made a part hereof. * * *"

Neither the contract nor the General Provisions contained any plans or specifications for the containers other than the requirements that they should be "waterproof," and neither did they contain particulars relating to inspection and tests other than as set forth in article 3 of the General Provisions, as follows:

" * * * Inspection and Tests.—The Contract Products and all workmanship, equipment, materials, and articles incorporated therein shall be the best suited of their respective kinds for the work to be performed hereunder, and shall be subject to inspection and tests by Buyer at any time, and by other agencies to the extent required by law or directed by Buyer. All materials or workmanship not conforming to the plans and specifications rejected by the inspectors will be promptly replaced by Vendor at its own cost and expense. * * *"

As the contract provided, and as plaintiff knew, the metal containers were being procured by defendant for use as receptacles in which to pack blankets and stow them on life rafts on board merchant vessels, to be used in an emergency in the manner set forth in finding 8. However, the nature of the intended use and the extent to which the containers would be exposed to water

when life rafts were launched, and to the elements while on board vessels, were not such, in view of plaintiff's specification which was accepted by defendant, as to require plaintiff to interpret the contract provision that the containers be "waterproof" to mean that they must be "watertight" when submerged and subject to a head water pressure of 18 to 36 inches for a period of five minutes or more.

The evidence and findings 21, 22, and 23, show that the terms "waterproof" and "watertight" are not used interchangeably either generally or in marine matters. While both terms generally signify imperviousness to water, the important difference between them, which is generally accepted and understood, is one of degree, "waterproof" signifying the lesser degree of imperviousness and "watertight" the greater degree.

Plaintiff bases its asserted right to recover damages of $3,316.40, made up of the figures set forth in finding 27, on the principal ground that defendant breached the contract by requiring that the blanket containers meet a watertight test made by submerging and holding the containers under water pressure of 1 to 36 inches for three to five minutes (see findings 16 and 17). Plaintiff contends that if the contract called for a test as a condition to the acceptance of the containers, a waterproof rather than a watertight test was intended by the contract and that a hose test, which was not used by defendant, was reasonable and adequate and should have been used for the purpose of determining whether or not the containers in question were waterproof. A hose test consists of playing a stream of water from an ordinary one-inch hose on the article to be tested from a distance of ten feet (findings 18 and 21). While it may be said that, under the definition of the word "waterproof," a hose test is one method of ascertaining whether an article is waterproof, the question here is to what degree or extent did the contract require the containers to be waterproof. It cannot be said that the hose test is the best or only method to be used in a case where the contract does not set forth the particulars with reference to the test to be made, but does show the nature of the intended use of the article. Nor can it be said that,

under the facts and circumstances of this case, the contract in suit contemplated or required that a hose test be used in preference to some other reasonable method of testing the containers for the purpose of determining whether they were sufficiently waterproof to satisfy the reasonable requirements of that term as used in the contract.

■■ We agree with plaintiff that the contract and specification did not call for watertight containers, but it seems reasonably clear that the contract did call for containers which would be sufficiently waterproof to be reasonably impervious to water when subject to tests under conditions substantially similar in degree to the water conditions to which the containers would be subject when put in use on life rafts.

Under the facts of this case we think plaintiff was not justified in believing, when it accepted and signed the contract on November 29, 1943, that defendant would be required under the terms of the contract, which disclosed the nature of the intended use of the containers, to accept containers which, when tested by the standard above mentioned, were found not to be sufficiently waterproof to keep their contents dry during the time such containers would be exposed to the elements and action of waves of the sea while stowed on board vessels and during the indefinite time they would remain at least one-half submerged in water after the life raft had been launched.

■ Although we cannot agree with defendant's position that it was authorized under the contract to demand, as a condition to the acceptance of the containers, that they should be impervious to water to a degree sufficient to satisfy a watertight test made by completely submerging the containers and holding them under a water pressure of 18 to 36 inches for a period of five minutes, it does not necessarily follow that all the tests which defendant's inspectors made of the containers must be rejected by the court merely because the Chief of the Materials Section of the Maritime Commission, when ordering an inspection, directed the inspectors to make "sure that the containers are watertight." (See find-

ing 13.) If, when making the tests directed, certain of the tests made were of such character as to show that the containers were not "waterproof" within the reasonable intendment of the contract, plaintiff cannot recover damages.

On December 21, 1943, plaintiff had completed the manufacture of 1,000 containers, of which 400 had been painted and, subject to inspection, were ready for delivery. The remaining 600 were complete except for painting. On that date one of defendant's inspectors made 15 tests from the lot of 400 containers, as set forth in finding 16. These tests were made by submerging certain locked containers lengthwise in a tank of water 11 or 12 inches deep and holding them in that position for three to five minutes. One out of every three containers so tested leaked. He reported to the Commission that the 400 containers had been rejected. In the circumstances of this case we cannot say that these tests were too severe in view of the fact that the use for which they were being procured would have subjected the containers to substantially the same conditions, especially after a life raft had been launched.

Later, on December 23, two other inspectors of defendant again made four different tests of containers out of the lot of 400, as set forth in finding 17. The first of these four tests was made in substantially the same manner as the test which had been previously made, except that the containers were subjected to a headwater pressure of 18 to 36 inches for five minutes or more. We think that this test was too severe for the purpose of the contract. However, in our opinion the remaining three tests made on December 23, 1943, as a result of plaintiff's protest that the others had been too severe, were reasonable waterproof tests. These tests disclosed that the containers were not waterproof to a degree sufficient to satisfy the requirement of the contract in that regard.

One of these three tests consisted of the insertion of an open container in water, bottom down, to a depth of three fourths of its length of 17 inches, and it leaked around the bottom. Three such tests were made, and two of three containers so tested leaked. In its proposal, which was made a part of the contract, plaintiff represented that the spot welded and soldered seams of the containers would be "watertight."

Another test consisted of substantially filling a container with water, locking the cover on and inverting the container. In this test leakage occurred around the top. Three such tests were made, and in each instance the tested container leaked. The evidence indicates that this leakage occurred because the rubber gasket inside the cover or lid was in four pieces instead of one piece as shown in plaintiff's sketch (finding 11).

The third of these tests consisted of laying an empty locked container on the surface of the water lengthwise and allowing it to float. After three to five minutes it was removed and opened and water was found in it.

We think these three tests were proper and reasonable under the contract and that they were sufficient to show that the containers were not waterproof, within the intent and meaning of the contract. In these circumstances the defendant was justified in rejecting the containers and in terminating the contract as to the remainder, and its action in doing so did not constitute a breach of the contract. It is immaterial, therefore, so far as plaintiff's right to recover is concerned, that defendant predicated its rejection of the manufactured containers and the termination of the contract as to the balance called for on the erroneous ground that the containers did not satisfy a water tight test. See College Point Boat Corporation v. United States, 267 U.S. 12, 15, 16, 45 S.Ct. 199, 69 L.Ed. 490.

Plaintiff is not entitled to recover, and the petition is dismissed. It is so ordered.

WHALEY, Chief Justice, and MADDEN, JONES, and WHITAKER, Judges, concur.