JOHN REINER & COMPANY, Individu-
ally and to the Use of Kurz & Root
Company (Incorporated)

v.

The UNITED STATES.

No. 431–57.

United States Court of Claims.

Dec. 13, 1963.

George Zolotar, New York City, for plaintiff. Charles Rembar, New York City, of counsel.

Edwin J. Reis, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for the defendant. A. H. Boudreau, Jr., Washington, D. C., was on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

In May 1956 the Corps of Engineers advertised for bids on 3,567 generator sets to be purchased by the Army. The invitation stated that "the Government desires delivery" of the items in accordance with a definite schedule (ranging from September 30, 1956, to August 31, 1957), but it was also provided that "in the event bidder is unable to make deliveries in accordance with the foregoing schedule, he shall set forth in the space below his proposed delivery schedule." Immediately beneath this blank space for the bidder's own delivery schedule, the form declared:

"Bids offering a proposed delivery schedule which will extend the time for the delivery of the quantities as called for in any delivery period of the foregoing delivery schedule by more than 60 days, *may* be cause for rejection of bid [emphasis added]."

Plaintiff John Reiner & Company submitted a bid with its own delivery schedule specifying dates more than 60 days after those listed by the Government in the invitation. When the bids were opened on June 21, 1956, Reiner was the lowest in price of the thirteen bidders. Seven others proposed their own delivery schedules, some (like Reiner) offering delivery dates more than 60 days beyond the invitation times. The Corps of Engineers then inquired of the requisitioning agency (the Signal Corps) whether plaintiff's schedule was satisfactory and met its requirements. Upon receiving an affirmative reply, the Engineers notified plaintiff by telephone, on June 29, 1956, that its bid had been accepted; this was followed by a written notice of award received on July 2, 1956. The formal contract came shortly thereafter.

Plaintiff proceeded to negotiate with suppliers of the main components of the generator sets and to incur certain other limited costs under the contract. Before it was well launched, however, it received word from the defendant (on August 3, 1956) to suspend all operations under the contract until further notice and to inform its suppliers and subcontractors accordingly. This came about because, unknown to plaintiff, an unsuccessful bidder had prevailed upon the General Accounting Office to rule that the award was improper and the contract should be cancelled. That Office felt that the invitation did not adequately inform bidders as to how they should bid with respect to delivery dates.

Plaintiff's efforts to have the Comptroller General's decision reversed were fruitless, and on September 21, 1956, the

contracting officer informed plaintiff that in compliance with the ruling its contract was cancelled. On September 24th, Reiner replied that the Comptroller General's decision was not binding on the Army and that the contractor considered the cancellation a breach for which it would seek recovery of full damages. This suit was then brought for breach of the contract.

## I

The initial question is whether the award was illegal and void so that the plaintiff cannot found a court action upon it. This inquiry, we believe, is not precisely the same as that with which the Comptroller General dealt. Because of his general concern with the proper operation of competitive bidding in government procurement,[1] he can make recommendations and render decisions that, as a matter of procurement policy, awards on contracts should be cancelled or withdrawn even though they would not be held invalid in court. He is not confined to the minimal measure of legality but can sponsor and encourage the observance of higher standards by the procuring agencies. Courts, on the other hand, are restricted, when an invitation or award is challenged, to deciding the rock-bottom issue of whether the contract purported to be made by the Government was invalid and therefore no contract at all—not whether another procedure would have been preferable or better attuned to the aims of the competitive bidding legislation.

■ In testing the enforceability of an award made by the Government, where a problem of the validity of the invitation or the responsiveness of the accepted bid arises after the award,[2] the court should ordinarily impose the binding stamp of nullity only when the illegality is plain. If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit. Any other course could place the contractor in an unfortunate dilemma. If he questions the award and refuses to accept it because of his own doubts as to possible illegality, the contracting officer could forfeit his bid bond for refusing to enter into the contract. The full risk of an adverse decision on validity would then rest on the bidder. If he accedes to the contracting officer and commences performance of the contract, a subsequent holding of non-enforceability would lead to denial of all recovery under the agreement even though the issue of legality is very close; and under the doctrine of quantum meruit there would be no reimbursement for expenses incurred in good faith but only for any tangible benefits actually received by the defendant. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 566 n. 22, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); Clark v. United States, 95 U.S. 539, 542, 24 L.Ed. 518 (1877). It is therefore just to the contractor, as well as to the Government, to give him the benefit of reasonable doubts and to uphold the award unless its invalidity is clear. Cf. 17 Comp.Gen. 53, 54–55 (1937).[3]

■ Applying that norm, we cannot deem this award to have been a nullity. Reiner's bid was responsive to the invitation which allowed the bidders to set their own delivery schedules and went no further than to caution that schedules

---

1. For reflections of the Comptroller General's particular interest in the competitive bidding system, see 37 Comp.Gen. 251, 255 (1957); 28 Comp.Gen. 401 (1949); 17 Comp.Gen. 554, 557 (1938); 16 Comp.Gen. 565, 567 (1936).

2. The rules as to illegality for fraud, conflict of interest, or some like defect, may well be different.

3. As we hold below, the views of the Comptroller General can be largely effectuated and the interests of the Government protected through use of the termination-for-convenience clause to stop performance under the challenged contract.

extending the time over 60 days beyond that designated in the defendant's preferred ("desired") schedule *might* be cause for rejection. There was no statement or indication that time was of the essence. On other occasions plaintiff, answering the same type of invitation, had proposed schedules extending the procurement agency's desired schedule by more than 60 days and had been granted the contracts. This was an accepted form for procurement by the Corps of Engineers. There was no reason to think that in this particular invitation *"may* be cause for rejection" (emphasis added) meant *"will"* or *"shall"* be cause for rejection.

■ But, defendant urges, this very provision, with its implicit permission to propose longer schedules, vitiated the invitation. The "full and free competition" envisaged by the Armed Services Procurement Act of 1947, § 3, 62 Stat. 21, 22–23, as amended, 69 Stat. 551–52 (1955), 41 U.S.C. § 152 (1952 ed.), was stifled, it is said, by allowing bidders to present their own delivery program, no matter how protracted. One charge levied against this phase of the invitation is that it was so worded that bidders would not understand that they could depart from the listed schedule by more than 60 days. This does not seem probable. The form used the permissive word "may" instead of the mandatory "will" or "shall"; its ordinary meaning would be that bidders took their chances in offering a too-extended schedule but were not barred from shouldering that risk. In previous uses of this standard form bidders had apparently not felt themselves limited to a deviation of 60 days; in this very case others than Reiner extended their suggested dates for more than that period. There is no showing that any bidder was actually misled. Like much procurement prose, the delivery section of the invitation was not a stylist's model, but we think it conveyed its meaning sufficiently to ward off the charge of undue ambiguity.

The second vice defendant marks in the invitation is that it left both bidders and the contracting officer too much at large.[4] The latter might or might not accept a lower bid with an extended delivery schedule, rather than a "timely" one at a higher price. From the viewpoint of improving procurement procedures, the Comptroller General could well believe that some method of evaluating the bids according to both price and delivery dates should have been explicitly stated. That defect, however, was not so deep or so clear that it nullified the invitation as a matter of law. The bidders were not helpless. They were free to submit more than one bid if the delivery schedule affected their price proposals; they could file, if they wished,

---

4. The Armed Service Procurement Act of 1947, as amended, provided in pertinent part (41 U.S.C. § 152(a), (b) and (c) (1952 ed.)):

"Whenever advertising is required—

"(a) The advertisement for bids shall be a sufficient time previous to the purchase or contract, and specifications and invitations for bids shall permit such full and free competition as is consistent with the procurement of types of supplies and services necessary to meet the requirements of the agency concerned.

"(b) All bids shall be publicly opened at the time and place stated in the advertisement. Award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government,

price and other factors considered: *Provided,* That all bids may be rejected when the agency head determines that it is in the public interest so to do.

"(c) All bids or invitations for bids shall contain in their specifications all the necessary language and material required and shall be so descriptive both in its language and attachments thereto in order to permit full and free competition. Any bid or invitation to bid which shall not carry the necessary descriptive language and attachments thereto, or if such attachments are not available or accessible to all competent, reliable bidders, such bid or invitation to bid shall be invalid and any award or awards made to any bidder in such case shall be invalidated and rejected."

one price based on the Government's schedule, another on an extension of less than 60 days, and a third on an extension of over 60 days. The contracting officer, for his part, would be guided by the directives in the Procurement Act of 1947 to consider "the requirements of the agency concerned" and the bid which was "most advantageous to the Government, price and other factors considered." 62 Stat. 23, 41 U.S.C. § 152 (a), (b) (1952 ed.). To the extent that quicker delivery was called for by the procuring agency, the contracting officer would evaluate on the basis of price those bids meeting the earlier delivery requirement; if a delayed schedule turned out to be acceptable, the other bidders would enter the widened circle of competition. That would be the natural and proper way to proceed and that is the way the contracting officer did proceed. The Procurement Act was designed to leave to him business discretion of this type and measure. See S.Rep. No. 571, 80th Cong., 2d Sess., pp. 2–3. In the circumstances present here, the contracting officer did not assume for himself so great an area of judgment as to destroy the free competition (on a common basis) the statute demands. We hold, accordingly, that the award to plaintiff must be deemed lawful, not void.

## II

The next inquiry concerns the nature of the cancellation resulting from the Comptroller General's ruling and the damages to which the contractor is entitled. Plaintiff characterizes the cancellation as a clear breach, entailing the full common-law measure of recovery; it points out that the contracting officer did not purport to terminate the contract for the Government's convenience or to follow the procedures established for that kind of termination. Those were in fact the circumstances of the cancellation but the plaintiff's conclusion does not necessarily follow.

■■ If the contracting officer had deliberately employed the termination-for-convenience article of the contract, his action would have been entirely valid. Such termination is authorized "whenever the contracting officer shall determine" that it is "in the best interests of the Government." The broad reach of that phrase comprehends termination in a host of variable and unspecified situations calling (in the contracting officer's view) for the ending of the agreement; the article is not restricted, as plaintiff contends, to a decrease in the need for the item purchased. Under such an all-inclusive clause, the Government has the right to terminate "at will" (Davis Sewing Mach. Co. v. United States, 60 Ct.Cl. 201, 217 (1925), aff'd, 273 U.S. 324, 47 S.Ct. 352, 71 L.Ed. 662 (1927); Librach v. United States, 147 Ct.Cl. 605, 611 (1959)), and in the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive. See Line Constr. Co. v. United States, 109 Ct.Cl. 154, 187 (1947).

■ Here, termination would have been invoked in deference to the Comptroller General's declaration that the contract should be cancelled. The contracting officer did not agree with that opinion, but it is the usual policy, if not the obligation, of the procuring departments to accommodate themselves to positions formally taken by the General Accounting Office with respect to competitive bidding. That Office, as we have pointed out, has special concern with, and supervision over, that aspect of procurement. It would be entirely justifiable for the contracting officer to follow the general policy of acceding to the views of the Accounting Office in this area even though he had another position on the particular issue of legality or propriety. He would not be allowing the Comptroller General to dictate the termination of the contract but, rather, would be using termination as a means of minimizing a conflict with another arm of Government properly concerned with the con-

-tractual problem.[5] It cannot be contrary to "the best interests of the Government"—the controlling standard of the termination clause—to end a contract which the Comptroller General has branded as incorrectly advertised.

Plaintiff refers to decisions holding that a contracting officer should not ab-dicate his functions to another official (e. g., Sun Shipbuilding & Dry Dock Co. v. United States, 76 Ct.Cl. 154, 187 (1932)), but those were cases in which someone else made specific determinations of fact under the contract, for example, that the contractor was in default or had no excusable delays. In this case the contracting officer would not be shifting a problem to the General Accounting Office; he would simply be deciding that the Government's "best interests" required that as a matter of general policy he bow to an opinion of the Comptroller General on competitive bidding, even though he thought it wrong.

Plaintiff emphasizes, of course, that the contracting officer did not invoke the termination clause as we hold that he could well have done. But this phase of the contractual history does not compel us to hold that in cancelling the contract the contracting officer committed a common-law breach. Almost forty years ago, in College Point Boat Corp. v. United States, 267 U.S. 12, 15–16, 45 S.Ct. 199, 69 L.Ed. 490 (1925), the Supreme Court gave us the lead (speaking through Mr. Justice Brandeis) in a closely comparable case. The defendant purported to cancel a Navy contract in midstream, without benefit of any power of termination reserved in the agreement and without knowledge that the Navy had such authority under a World War I statute. "[S]o far as appears, neither party knew that the United States had such a right. The Navy Department failed to give the notice requisite to terminate the contract" (id.

at 15 of 267. U.S., at 200 of 45 S.Ct., 69 L.Ed. 490). It appeared on the surface that the defendant was anticipatorily breaching the contract. The Court held, nevertheless, that the contractor could only recover the measure of relief allowed by the termination statute. "A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later." Id. at 15–16 of 267 U.S., at 200–201 of 45 S.Ct., 69 L.Ed. 490 (footnotes omitted). The Government's right to terminate was held effective when asserted later in court, and recovery of prospective profits was barred.

The Supreme Court's ruling embraces this case. The broad termination clause in plaintiff's contract stands in the place of the statutory termination power involved in College Point Boat Corp. (the Act of June 15, 1917, 40 Stat. 182). Under that clause, we have shown above, the defendant had a valid ground to terminate. As the Supreme Court held, such "adequate cause" for termination may be asserted as a defense to a breach action even though it may not have been known at the time of cancellation. The contracting officer on plaintiff's contract probably thought that he was cancelling the agreement for illegality. That excuse was not a valid justification as we now know, but just as in College Point Boat Corp. a good ground did exist in the far-reaching right to terminate under the termination article. That justifiable cause controls the case and "operate[s] to curtail the damages recoverable" (267 U.S. at 16, 45 S.Ct. at 201, 69 L.Ed. 490).

**5.** If the Comptroller General's view was that the contract was void, termination would itself be inappropriate since the whole contract would be a nullity. Ter- . mination, however, would cushion a possible clash with the General Accounting Office.

Some of the foregoing may seem incompatible with certain observations in Klein v. United States, 152 Ct.Cl. 8, 16–20, 285 F.2d 778, 782–85 (1961). That case dealt with an erroneous termination for default which the defendant later sought to turn into a convenience termination. The only *holding* of the court (on this point) is that, once the Government wrongfully terminates for default where there has been no default, it cannot thereafter seek to avoid liability by invoking a convenience termination. That holding the court accepts and reaffirms today in Goldwasser v. United States, Ct.Cl., No. 477–61, 325 F.2d 722. Although some portions of the Klein opinion may seem to go beyond that holding if taken out of context, we now read the case as confined to the issue of default presented by its facts. Indeed, the Klein decision appears to have put aside situations like the present when it said that that case "has no resemblance to that of one who has terminated a contract for a stated reason, which turns out to be insupportable, but later discovers and relies on a valid reason for cancellation" (152 Ct.Cl. at 19, 285 F.2d at 784). See also Newark Fireproofing Sash & Door Co., Inc. v. United States, 69 F.Supp. 121, 124, 107 Ct.Cl. 606, 627 (1947).

■■ Just as the failure to invoke the termination article leaves untouched the defendant's right to rely on the damage limitation of that clause, so the failure to follow the termination procedures of the Armed Services Procurement Regulations (ASPR) is ineffective to broaden plaintiff's rights of recovery. Those regulatory provisions have the force of law (G. L. Christian and Associates v. United States, Ct.Cl., 320 F.2d 345), but a departure from their requirements does not convert a termination into a common-law breach subjecting the United States to liability for unearned anticipated profits any more than would a deviation from the procedures set forth in a statutory provision for termination. Unless the contractor can show that he has been injured by the failure to pursue the ASPR procedures, such a lapse is immaterial to his recovery. Cf. J. W. Bateson Co., Inc. v. United States, 308 F.2d 510, 514 (C.A. 5, 1962). Plaintiff does not claim, and there is no reason to believe, that it was hurt by the informal procedures followed here. As soon as the Comptroller General had ruled, Reiner was told to suspend all operations, to defer incurring any further expenses, and to inform its subcontractors and suppliers. It did so immediately. The amount of plaintiff's termination expenses is known because it has stipulated the exact sum recoverable on the basis of a convenience termination, i. e., $17,000.

This stipulation facilitates our disposition of the case. Since we hold that Reiner is entitled to recover only the amount collectible on a termination for convenience, and that sum is agreed to be $17,000, we shall enter judgment in that figure.

■ We add that, in the present circumstances, there is another ground, related but separate, why plaintiff is restricted to this stipulated amount. Even if we assume that the reasoning of College Point Boat Corp. is inapplicable, the plaintiff could not recover anticipated but unearned profits without clear and direct proof that it would have made such gains. United States v. Penn Foundry & Mfg. Co., Inc., 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949); United States v. Behan, 110 U.S. 338, 344, 4 S.Ct. 81, 28 L.Ed. 168 (1884). That type of proof is unavailable here because the plaintiff cannot show that its contract would have been allowed to continue to completion. A standard termination clause was ever-ready for use and it is more than likely that this contracting officer (who thought the award to plaintiff valid) would have acted explicitly under that provision to end performance legally as soon as someone be deemed authoritative had whispered in his ear that he was breaching the agreement by cancelling it in the way he did. Since plaintiff cannot show that that would not have happened, **it**

must fail in its quest for prospective profits. See the opinion of Mr. Justice Douglas for the four concurring Justices in Penn Foundry & Mfg. Co., supra at 216 of 337 U.S., at 1017 of 69 S.Ct., 93 L.Ed. 1308.

### III

Plaintiff Reiner sues also on behalf of Kurz & Root Company, an actual or potential subcontractor. After Reiner had received the award for the generator sets at the end of June 1956 it negotiated with Kurz & Root to supply the generators, one of the major components. An oral agreement was reached on July 10, 1956, and Kurz & Root then began preliminary work, but no written purchase order was executed prior to suspension of the prime contract on August 3, 1956. At that time Reiner advised Kurz & Root to stop all work. Defendant insists that no valid subcontract was ever made and that, in any event, nothing is recoverable on behalf of Kurz & Root.

We need not decide (i) whether Reiner had an enforceable agreement with Kurz & Root, (ii) if so, whether Reiner can sue on its subcontractor's behalf, or (iii) whether the claim is barred because not included in Reiner's own termination claim. The record fails to show that the subcontractor suffered any damages from the defendant's cancellation of the main contract. Almost nine months after this cancellation, the Government re-let the very same contract to another company (John R. Hollingsworth Corp.) and Kurz & Root obtained the subcontract to produce the 3,567 generators which it would have supplied to Reiner. It made a good profit on that subcontract, more than would necessarily have been expected and more than it claims it would have made on the subcontract with Reiner. Kurz & Root cannot obtain these profits twice. The Hollingsworth contract and subcontract would never have existed had there been no cancellation of the Reiner contract; nor is there substantial ground for belief that Kurz & Root lost other business because it undertook to supply Reiner. In these circumstances the gains made under the second contract must be deducted from the damages claimed for the alleged breach of the Reiner agreement. Restatement, Contracts, § 336, Comment c; Canton-Hughes Pump Co. v. Llera, 205 F. 209, 215 (C.A. 6, 1913); Ed. S. Michelson, Inc. v. Nebraska Tire & Rubber Co., 63 F.2d 597, 601 (C.A. 8, 1933).

Kurz & Root did incur some preliminary expenses on the Reiner generator but there is no evidence whether or not this work was useful in the performance of the Hollingsworth subcontract; moreover, the evidence of these out-of-pocket expenses was not well supported. On the whole record, we are justified in finding, as we do, that Kurz & Root has failed to prove that it was damaged to any appreciable extent by the suspension and cancellation of the Reiner contract. No right to recover has been shown.

Our conclusion is that plaintiff is entitled to recover $17,000 on its own claim and judgment will be entered to that effect. It is not entitled to recover on behalf of Kurz & Root Company and its petition will be dismissed to that extent.

LARAMORE, Judge (concurring).

I agree with the majority opinion. I write this because of my concurrence in the case of Goldwasser v. United States, Ct.Cl., No. 477–61, 325 F.2d 722.

In my opinion, the Goldwasser case is clearly distinguishable from the present case. The contract in the case of Goldwasser was, in my opinion, terminated for default. In that situation my belief is that plaintiff Goldwasser should have an opportunity to prove a breach thereof and resulting damages, if any.

The contract in the instant case was not terminated for default, and I believe under the circumstances of this case the correct measure of damages should be based on the cost resulting from the termination provision of the contract.

WHITAKER, Judge (dissenting in part).

Having written the opinion of the court in Goldwasser v. United States, Ct.Cl., No. 477-61, 325 F.2d 722, this day decided, it follows that I disagree with the opinion in this case. It reiterates, I think, the positions taken in the dissenting opinions in the Goldwasser case.

In Goldwasser, the defendant became dissatisfied with plaintiff's performance but it did not refuse further to honor the contract because plaintiff had defaulted in performance, but, instead, took refuge in the "indefinite-quantities clause of the contract, contending that under that clause it was no longer obligated to avail itself of plaintiff's services. Because we thought this clause was inapplicable and that defendant had wrongfully refused to further honor the contract unless plaintiff was actually in default, and because it did not take advantage of the termination-for-convenience-of-the-Government clause, we held this clause did not prescribe the measure of defendant's liability, if any.

Nor in the case at bar did defendant take advantage of the termination-for-convenience-of-the-Government clause; it cancelled the contract because, acting upon the opinion of the Comptroller General, it held that it had been awarded without compliance with the statute and was, therefore, a nullity. It is a contradiction to say that it terminated a contract that in law it asserted had never existed. Whether it had a right to do so or not is immaterial, because it did not in fact do so. The possession of a right means nothing unless that right is exercised.

As in the Goldwasser case, a cancellation of the contract because it had been illegally entered into involved no liability on the part of the Government; a termination for convenience did render the Government liable. The Contracting Officer chose the former course. The Government is bound by the action he took.

What I have said is in harmony with our holding in Klein v. United States, 152 Ct.Cl. 8, 285 F.2d 778 (1961).

The majority relies upon College Point Boat Corp. v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925), affirming 58 Ct.Cl. 380 (1923), but in that case there was no election by the Government between two alternative courses of action, one of which subjected the Government to liability and the other did not.