# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Puget Sound Environmental Corp. ) ASBCA No. 58828
)
Under Contract No. N00406-10-D-1001 )

APPEARANCE FOR THE APPELLANT: Mr. Carlos Moreno
President

APPEARANCES FOR THE GOVERNMENT: Ronald J. Borro, Esq.
Navy Chief Trial Attorney
Stephanie Cates-Harman, Esq.
Assistant Director
Stephen L. Bacon, Esq.
Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE O'CONNELL ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Board on the parties' cross-motions for summary judgment. For the reasons set forth herein, we deny appellant's motion for summary judgment and grant the government's cross-motion.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTIONS

The following facts are undisputed unless stated otherwise.

*Introduction*

This appeal arises from a certified claim that appellant, Puget Sound Environmental Corp. (PSE), submitted on two Navy contracts, Contract No. N00406-10-D-1001 (contract 1001) and Contract No. N00406-08-D-8113 (contract 8113). The claim contained two discrete issues and the Board assigned two appeal numbers. In *Puget Sound Environmental Corp.*, ASBCA Nos. 58827, 58828, 14-1 BCA ¶ 35,585 (*PSE I*), we dismissed ASBCA No. 58827, in which PSE sought about $2.16 million due to the government's alleged misclassification of prevailing wage rates on the two contracts (R4, tab 31 at 794, 799). In ASBCA No. 58828, PSE seeks just under $3.3 million due to the government's termination for convenience of Task Order No. 9 on contract 1001 (*id.* at 794-99). While we dismissed the claim relating to contract 8113 in *PSE I*, a brief history of both contracts is necessary to understand the issues currently before us.

*Contract 8113*

Contract 8113 was a labor hour, indefinite-delivery, indefinite-quantity, service contract effective 30 April 2008 (R4, tab 2 at 43-44). The performance work statement provided that PSE would provide "qualified personnel to accomplish General Labor (includes Labor, Firewatch, Lead Work & Tank Watch) aboard vessels or at naval shore facilities under the cognizance of" Puget Sound Naval Shipyard and Intermediate Maintenance Facility (R4, tab 2 at 50). As we recounted in *PSE I*, the contract contained various clauses that required PSE to comply with the Service Contract Act (SCA), 41 U.S.C. §§ 6701-6707, and incorporated a Department of Labor (DOL) wage determination. *PSE I*, 14-1 BCA ¶ 35,585 at 174,368.

After a DOL investigation, PSE, through its president, Carlos Moreno, signed a "Back Wage Compliance And Payment Agreement" with DOL dated 8 September 2009 (R4, tab 55). In this agreement, PSE agreed to pay back wages in the amount of $382,178 to 220 employees by 25 September 2009. PSE did not pay the amounts due and on 7 January 2010 entered into another back wage and compliance agreement with DOL (R4, tab 57). For reasons that are not clear, this agreement stated that PSE owed 214 employees $372,103.32. The amounts at issue primarily involved unpaid health and welfare benefits (R4, tabs 50, 54, 85). PSE concedes that it did not pay all of the amounts due under the January 2010 agreement[1] (app. resp. at 5, ¶ 14). According to PSE, it paid 44 of the employees but still owes $314,863.27 (R4, tab 85 at 2, tab 89 at 4).

The January 2010 agreement provided for an initial payment of $100,000, which PSE by its own admission did not make, followed by monthly payments of $24,681.24 starting 7 March 2010, and ending on 7 January 2011 (R4, tab 57). Accordingly, the January 2010 agreement provided for payment in full long before DOL launched a second investigation of PSE and long before the contracting officer terminated Task Order No. 9 on contract 1001 for convenience, as detailed in the undisputed facts below.

*Contract 1001*

The government awarded contract 1001 to PSE on 13 October 2009, or five weeks after PSE signed the initial back wage compliance and payment agreement with DOL (R4, tab 11). It is undisputed that the Navy knew about the back wage issues on contract 8113 but the contracting officer determined to award contract 1001 to PSE based upon the

---

[1] In its response brief, PSE seems to dispute that it entered into the September 2009 agreement with DOL (app. resp. at 2, ¶ 5). PSE does not explain its position even though Mr. Moreno's signature appears on both the September and January agreements. This is not material because PSE concedes that it entered into the January 2010 agreement and that it failed to pay the full amount due (*id.* at 2, ¶ 5, at 5, ¶ 14).

apparent resolution of the issues on 8113 (gov't Statement of Undisputed Material Facts (SUMF) ¶¶ 13-14 (citing R4, tabs 47-54); app. resp. at 2, ¶¶ 13-14). Like contract 8113, contract 1001 was a time-and-material, indefinite-delivery, indefinite-quantity, service contract (R4, tab 11 at 315). Also like the earlier contract, the performance work statement for contract 1001 provided that PSE would perform general labor, tank/void watch, firewatch, and lead handler support services aboard active duty and reserve fleet, nuclear and non-nuclear powered U.S. Naval vessels homeported in the Puget Sound Washington State area of responsibility (*id.* at 317). The initial period of performance was 13 October 2009 through 12 October 2010 at a not-to-exceed amount of $8,233,897.50 (R4, tab 11 at 313-15). By Modification No. P00003, the contracting officer exercised option 1 (also referred to as "Lot two"), extending contract 1001 to 12 October 2011 and increasing the not-to-exceed amount to $16,485,150.50 (R4, tab 11(c) at 430). During those two years, the Navy issued task orders in the not to exceed amount of $4,795,543.17 (R4, tabs 12-27).

To exercise an option, the government had to provide a preliminary notice to the contractor 60 days before the end of the contract and had to exercise the option within 10 days of contract expiration (R4, tab 11 at 363 (FAR 52.217-9)). The contract contained a total of four option years (Lots two to five) (R4, tab 11 at 315).

*The Second DOL Investigation*

Contract 1001 incorporated various Federal Acquisition Regulation (FAR) clauses that are significant to this dispute, including FAR 52.222-41, SERVICE CONTRACT ACT OF 1965 (NOV 2007) (R4, tab 11 at 360); and FAR 52.222-42, STATEMENT OF EQUIVALENT RATES FOR FEDERAL HIRES (MAY 1989). This latter clause provided:

> [T]his clause identifies the classes of service employees expected to be employed under the contract and states the wages and fringe benefits payable to each if they were employed by the contracting agency subject to the provisions of 5 U.S.C. 5341 or 5332.
>
> THIS STATEMENT IS FOR INFORMATION ONLY: IT IS NOT A WAGE DETERMINATION
>
> Employee Class      Monetary Wage-Fringe Benefits
>
> Laborer #23470      $18.78 Per Hour for WG 03

(R4, tab 11 at 364) The contract also incorporated DOL Wage Determination 05-2559, Rev. 11 (*id.* at 393). This wage determination included hourly rates for occupation code 23470, laborer, at $13.77 + $3.35 in fringe benefits, and, significantly, based on the events that followed, a rate of $16.24 + $3.35 for occupation code 23580, maintenance trades

3

helper (*id.* at 397, 399), and a rate of $29.26 + $3.35 for occupation code 30090, environmental technician (*id.* at 398).

Sometime in the summer of 2011, DOL started a new investigation of PSE. DOL conducted a "compliance review" at PSE's office on 8 August 2011 and interviewed PSE employees at the job site the following day. (App. mot. at 2, encls. II, III; gov't SUMF ¶ 32). On 1 September 2011 DOL wrote to the contracting officer, Gary Whitehead, asserting that its "investigation revealed that [PSE] failed to pay the prevailing wage rates, holidays, and health and welfare as required under the SCA" in the estimated amount of $1,270,195. DOL requested that the Navy withhold contract payments in this amount from PSE. (R4, tab 28 at 1) On 12 September 2011, Mr. Moreno signed an "Authorization For Transfer And Disbursement Of Contract Funds," in which PSE authorized the Navy to transfer to "DOL funds due to [PSE] on Contract N00406-10-D-1101 [sic]. The amount so transferred is to be disbursed to employees due back wages found due on the contract I entered into with" the Navy. (R4, tab 80 at 3)

Ultimately, DOL alleged that PSE owed its employees a combined total of $1,409,409.98 on contracts 8113 and 1001 (R4, tab 88, ex. 12 at 10). This amount consisted of $679,251.98 due to the classification of workers as laborers when, in DOL's view, they should have been classified as maintenance trades helpers or environmental technicians (*id.* at 5-6, ¶¶ 21-22). DOL calculated that PSE owed a further $60,188.92 in prevailing wage holiday back pay because it failed to pay the vast majority of its workers the minimum of ten paid holidays (*id.* at 6, ¶¶ 23-24). DOL calculated that PSE failed to pay its employees contractually required vacation pay amounting to $36,525.83 (*id.* at 6-7, ¶¶ 25-27). Finally, DOL concluded that PSE owed a further $633,109.25 in health and welfare fringe benefits. Among other things, DOL alleged that PSE had provided health insurance cards to its employees; after they sought medical care, they were left with costly medical bills when they learned that the insurance cards were not valid. (*Id.* at 7-9, ¶¶ 27-37)

On 12 May 2014, an administrative law judge at DOL's Office of Administrative Law Judges issued a "Decision and Order Granting Summary Decision" in which he held that DOL had been correct to assess $1,409,409.98 in back wages and that PSE should be debarred from federal contracting for three years[2] (R4, tab 90 at 1). On 6 July 2014, PSE filed an appeal with DOL's Administrative Review Board (ARB) (R4, tab 91). In a 4 May 2016 final decision and order, the ARB affirmed the administrative law judge's decision. *Administrator, Wage & Hour Div., Dep't of Labor v. Puget Sound Environmental*, ARB Case No. 14-068, 2016 WL 3135580 (R4, tab 102). In a supplemental brief filed after the ARB issued its decision, PSE states that it intends to challenge this ruling in federal court (PSE suppl. br. at 2).

---

[2] The respondents in this action were PSE, Mr. Moreno, and More Support Services, a company that shared management with PSE (R4, tab 90 at 6-7).

4

In this appeal, there is no dispute that PSE paid wages at a rate lower than those advocated by DOL, nor is there any dispute over the contract language that identified laborer as the expected service class for the contract work. But we will not address the misclassification of workers in this opinion because we dismissed that issue in *PSE I*. However, we agree with DOL's ARB that PSE's misclassification of workers is irrelevant to PSE's other violations of the Service Contract Act, namely by failing to (1) pay employees for legal holidays; (2) pay employees for vacation time; and (3) provide health and welfare benefits (R4, tab 102 at 13, n.50). PSE has not filed a meaningful response to the Navy's allegations concerning these three issues and we conclude that they are undisputed. Further, it is also undisputed that PSE failed to pay the amounts to which it agreed in the back wage agreement for contract 8113.

*Termination of Task Order No. 9*

Task Order No. 9 included a total funded amount of $258,092.45 (R4, tab 20(a) at 618-19). As of 8 September 2011, the Navy had paid $238,231.32 for services under the task order, meaning that $19,861.13 remained available (R4, tab 97, ¶ 15). Task Order No. 9 was the only pending task order at that time (*id.* ¶ 14).

Contracting officer Whitehead emailed PSE on 8 September 2011 stating that the "Government no longer has a need for the firewatch/laborer services provided under task order" No. 9, and that it would be terminated for the convenience of the government effective 4:00 p.m. the next day (R4, tab 29). Contract 1001 incorporated FAR 52.212-4, CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS, ALT I (OCT 2008), which provided at 52.212-4(l) that "[t]he Government reserves the right to terminate this contract, or any part hereof, for its sole convenience" (R4, tab 11 at 356). On 15 September 2011, the parties signed a bilateral modification terminating Task Order No. 9 for the convenience of the government[3] (R4, tab 20(d) at 625, 627).

The government did not issue any further task orders on Lot two, which expired five weeks after termination of Task Order No. 9. The government did not exercise the options for Lots three to five. On 3 October 2011 the Navy awarded a bridge contract for the same services to another contractor but did not issue a task order on that contract until 31 January 2012 (R4, tab 96 at 12, tab 100).

*PSE's Certified Claim*

On 17 May 2013, PSE submitted a claim certified under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (R4, tab 31 at 794). With respect to the current appeal, PSE contended that it lost potential revenue of $82,425,752.50 ($16,485,150.50 per year) over

---

[3] In this modification, the parties mistakenly cited FAR 52.249-4 instead of FAR 52.212-4 (R4, tab 20(d) at 625).

five years if the government had exercised all of the options. It sought four percent of that amount, $3,297,030.10, in damages. (*Id.* at 799) The contracting officer did not issue a final decision and PSE filed a notice of appeal from the deemed denial of its claim at the Board on 9 August 2013 (*id.* at 793).

DECISION

### I. Summary Judgment Standards

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a motion for summary judgment, the Board's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* at 249. Conclusory statements and mere denials are not sufficient to ward off summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). The fact that both parties have moved for summary judgment does not mean that the Board must grant judgment as a matter of law for one side or the other. Rather, the Board must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration. *Id.* at 1391 (citations omitted).

### II. Analysis of PSE's Claim

In *PSE I*, we determined that, although PSE had styled its claim "Improper Contract Termination," the implicit basis for the claim was a bad faith termination. *PSE I*, 14-1 BCA ¶ 35,585 at 174,370. Before we proceed any further, we must take a closer look at what PSE is actually seeking here. As we found, PSE is seeking four percent of a total contract value of more than $82,425,752.50 over five years, which is the sum of $16,485,150.50 in all five years of the contract. However, when the contracting officer exercised the first option, this increased the not-to-exceed amount of the contract to a total for the first two years of $16,485,150.50 (R4, tab 11(c) at 430), the precise amount per year upon which PSE bases its claim. The contract stated that the estimated number of labor hours per year would remain constant over five years at 319,000, plus 500 overtime hours (R4, tab 11 at 372), meaning that there is no indication that the level of effort might increase significantly in the final three option years. Thus, it is not clear how the contract value could have approached the $82.4 million upon which PSE premises its claim.

Moreover, the not-to-exceed amounts in the base and first option year are one thing, the actual value of issued task orders is another. The Navy issued only $4,795,543.17 in task orders during that time period. Thus, as best we can determine, the only way PSE's claim could work from a mathematical perspective is if the Navy had awarded task orders totaling more than $77 million in the last five weeks of option year one and the final three option years. But there is no evidence that the government's requirements would have risen

6

to that level. Based on the estimates in the contract and the experience of the first two years, the not-to-exceed amount for the final three option years, if exercised, would likely have totaled about $25 million.

Finally, we also note that applying PSE's method of multiplying lost contract revenue by four percent indicates that its claim with respect to the only aspect of contract 1001 that the contracting officer actually terminated, Task Order No. 9, is nearly *de minimis*. As we found, at the time of termination, only $19,861.13 remained on this task order. Four percent of this number is $794.45.

### III. Board Review of a Failure to Exercise Options

Our analysis demonstrates that this appeal is primarily about the government's failure to exercise options rather than the termination of Task Order No. 9. In an option contract, the government has bargained for the right to exercise or not exercise the option at its discretion and a contractor cannot compel the government to exercise the option. *Government Systems Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed. Cir. 1988). The Board has recognized a limited exception to this rule if the contractor can prove bad faith, an abuse of discretion or that the contracting officer acted in an arbitrary or capricious manner. *IMS Engineers-Architects, P.C.*, ASBCA No. 53471, 06-1 BCA ¶ 33,231 at 164,674, *recon. denied*, 07-1 BCA ¶ 33,467, *aff'd*, *IMS Engineers-Architects, P.C. v. Geren*, 274 F. App'x 898 (Fed. Cir. 2008). Similarly, the government has the right to terminate at will under the termination for convenience clause and, absent bad faith or a clear abuse of discretion, the contracting officer's decision is final. *John Reiner & Co. v. United States*, 325 F.2d 438, 442 (Ct. Cl. 1963).

It is well established that government officials are presumed to act in good faith. *Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012). To prove that a government official acted in bad faith, a contractor "must show a 'specific intent to injure'" by clear and convincing evidence. *Id.* at 1369 (quoting *Am-Pro Protective Agency v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002)). "Due to this heavy burden of proof, contractors have rarely succeeded in demonstrating the Government's bad faith." *Krygoski Construction Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996). In deciding the cross-motions for summary judgment, we must determine whether a reasonable fact finder could find by clear and convincing evidence that the contracting officer acted in bad faith. *Am-Pro*, 281 F.3d at 1241.

### IV. Analysis of PSE's Case for Bad Faith

PSE has filed three briefs (plus a supplemental brief after the ARB issued its decision). It filed the opening brief; the government then filed a response and cross-motion, to which PSE filed a response. After the Navy notified the Board on 7 March 2016 that it did not intend to file a reply brief, PSE determined that this required further action on

its part and on 31 March 2016 it filed another document entitled "Motion for Summary Judgment" (app. 2nd mot.) which is effectively a second response to the Navy's cross-motion. Although the Navy has objected to PSE filing a third brief, we will consider it to ensure that we fully understand PSE's contentions.

A.     PSE Contends that the Contracting Officer Rushed to Judgment

PSE's central contention is that "within a matter of 30 days, from August 8, 2011 to September 9, 2011, both Ms. Leung [the DOL investigator] and Mr. Whitehead rushed to judgment toward taking severe action against Mr. Moreno" (app. 2nd mot. at 4). As we found above, DOL alleged as early as 1 September 2011 that PSE owed back wages of more than $1.27 million. PSE notes that this was only a preliminary determination and contends that DOL, in essence, lacked adequate documentation to make an accurate determination. But the undisputed evidence shows that the preliminary determination of $1.27 million was within about 10 percent of DOL's final calculation of just over $1.4 million.

The flaw in PSE's argument is its focus on the timing of DOL's actions rather than the accuracy of its conclusions. In other words, PSE has not provided us with any evidence that DOL is wrong (and that the contracting officer's reliance on DOL is actionable). For example, with respect to the allegation that PSE failed to pay health and welfare benefits, if DOL was wrong and PSE had paid for these benefits, it would have been relatively simple to establish this. But, PSE has failed to provide any such evidence.

In its briefs, PSE contends that the contracting officer could not take any action before conclusion of the administrative proceedings at DOL but fails to cite any precedent (see, e.g., app. resp. at 10). The Service Contract Act clause, FAR 52.222-41(k), does not impose any such requirement. Rather, this provision specifically provides that "any failure to comply with the requirements of this clause may be grounds for termination of the right to proceed with the contract work" without limiting this right to the point in time after administrative review at DOL. Because the contracting officer must make decisions in real time and cannot afford to wait for the conclusion of administrative proceedings that may take years, the issue is whether the contracting officer had a reasonable basis for his decision at the time. See Copeland v. Veneman, 350 F.3d 1230 (Fed. Cir. 2003) (even though DOL concluded years later that withholdings were excessive, contracting officer acted reasonably in withholding contract payments for Davis-Bacon Act violations based on the information that he had at the time). This analysis is particularly appropriate here because PSE's claim is based largely on the contracting officer exercising options; as we found, the contracting officer had to make a decision on the Lot two option by 13 August 2011.

PSE spends a lot of energy focusing on the minutes of a meeting attended by the contracting officer on 12 August 2011, the day before the option had to be exercised (R4, tab 68). PSE contends that these minutes demonstrate the contracting officer's bad

faith (*e.g.*, app. 2nd mot. at 2-3). Even viewed in the light most favorable to PSE, the meeting minutes do not help PSE. As we have found, by the time of this meeting PSE had long since defaulted on the back wage agreement for contract 8113. The minutes state, under the heading "Dept of Labor Investigations" that there has been "No real improvement since last contract," that there were "Approx $1M back wages" and that "Employees' health coverage requests are being refused," all of which are consistent with our findings of undisputed facts. Faced with the recurring issue of PSE's failure to pay its employees, and with the clock ticking down on the option deadline, it was reasonable for the contracting officer to decline the option. There is simply no evidence that even hints at a specific intent to injure PSE, let alone proving such an intent by clear and convincing evidence. *Sach Sinha and Assoc., Inc.*, ASBCA No. 47594, 00-1 BCA ¶ 30,735 at 151,867.

### B.    PSE's Other Contentions

PSE also contends that "[t]hough the government's action was not a termination for default [TFD] it most certainly did have the effects of a TFD. In short, FISC/Navy exercised its power to terminate PSE's contract by circumventing the procurement process." (App. mot. at 7) It is not clear what this means. The termination of Task Order No. 9 for convenience did have a similar effect as a termination for default in the sense that it ended the task order. Although the government has raised what could perhaps be grounds for a termination for default, it had a separate contractual right to terminate the contract for convenience. The government has the right to terminate at will under this clause and, absent bad faith or a clear abuse of discretion, the contracting officer's decision is final. *John Reiner & Co.*, 325 F.2d at 442.

PSE raises two other related contentions. In the 8 September 2011 email that the contracting officer sent to PSE informing it of the termination of Task Order No. 9 for convenience, the contracting officer stated that the government no longer had a need for the services. However, earlier that same day, in an internal Navy email, the contracting officer stated that he was concerned about awarding another task order to PSE because of the likelihood that PSE would "commit Fraud against their employees" (R4, tab 78), which, in PSE's view, demonstrates the contracting officer's bad faith. PSE also notes that the government has defended this action based on Service Contract Act violations and other breaches, which is inconsistent with the contracting officer's statement to PSE in September 2011 that the government no longer needed the services.

While the contracting officer's 8 September 2011 email notifying PSE of the termination was probably less than candid given the Navy's concerns about worker pay and other issues, it is also undisputed that the contracting officer did not execute a task order with another contractor for nearly four months after the PSE termination for convenience (*see* R4, tab 100) and it was, therefore, literally true that the Navy had no immediate need of those services from a contractor. Moreover, while the contracting officer's use of the word "fraud" in PSE's view demonstrates that the contracting officer had an animus for PSE, the

undisputed facts show otherwise. First, PSE defaulted on a back pay agreement with respect to contract 8113 that arose primarily from a failure to pay health and welfare benefits, meaning that the workers on that contract have not been paid in full. Second, on contract 1001, DOL alleged that PSE, among other things, not only again failed to pay health and welfare benefits, it specifically led workers to believe that they had health insurance, which resulted in them obtaining medical services only to find that they would be responsible for the bills. Whether fraud was the best word choice is not the issue before us; the undisputed facts show that the contracting officer had a good faith basis for concluding that PSE failed to pay its employees in accordance with the contracts and that it had deceived those employees by leading them to believe that they had health insurance when, in fact, they did not.

## C.    PSE's Recitation of "Facts" Showing Bad Faith

PSE's third brief, while largely repetitive of its earlier briefs, appears to contain the most refined distillation of its case. PSE sets forth in this brief five "facts" that, in its view, demonstrates the contracting officer's bad faith:

a.    Prior to meeting with the DOL investigators on about 10 August 2011, the contracting officer's representative told PSE employees that the purpose of the meeting was "contract review" (app. 2nd mot., ex. 8);

b.    Prior to conducting these interviews, the government did not notify Mr. Moreno (app. 2nd mot. at 3-4);

c.    In a declaration dated 15 October 2015 the contracting officer lied when he testified that the investigator assigned to review PSE's confidential facility clearance application stated that he stopped Mr. Moreno's personal security clearance investigation in February 2011 and that he did not intend to issue a clearance to Mr. Moreno (R4, tab 97, ¶ 7);

d.    In an 8 September 2011 email to other Navy officials, the contracting officer slandered Mr. Moreno when he expressed concern that PSE would commit fraud against its employees if issued any more task orders (app. 2nd mot. at 3); and

e.    Mr. Whitehead misled his agency when he stated that a DOL investigator visiting the office was "looking for fiduciary violations, by PSE, dealing with mishandling of insurance and retirement funds collected from employees, instead of the real reason" for the investigator's visit (app. 2nd mot. at 4).

Even viewed in the light most favorable to PSE, we do not see how any of these "facts" demonstrate a specific intent to injure. With respect to (a) and (b), compliance with the Service Contract Act was part of the contract. Monitoring PSE's compliance

with that Act, particularly in light of the admitted violations on contract 8113, was entirely appropriate. Nor do we agree that the contracting officer's representative misled the employees by describing the purpose of the meetings as "contract review." PSE also has not identified any statute, regulation, or contract provision that required the contracting officer to notify Mr. Moreno before DOL met with the employees.

In (c), PSE makes the serious allegation that the contracting officer lied in a declaration submitted to the Board when testifying about one of the Navy's alternate grounds for the termination. In the testimony at issue, the contracting officer relates a conversation between him and an unnamed investigator in May 2011. PSE does not allege that it was present during the conversation, nor does it present testimony from anyone who was present. PSE does not present any direct evidence that the testimony is untruthful and it does not, in any event, have anything to do with the SCA issues.

We addressed point (d) and the contracting officer's use of the word "fraud" above. Finally, with respect to point (e), PSE does not explain why this statement was false or demonstrated a specific intent to injure PSE, nor does PSE state what the "real reason" was for the DOL investigator's visit in early October 2011.

## D.    Final Analysis

Based on all of the foregoing, we conclude that PSE cannot demonstrate by clear and convincing evidence that the contracting officer had a specific intent to injure PSE. In this regard we observe that PSE's central contention – that the contracting officer rushed to judgment when he terminated Task Order No. 9 and declined to exercise the second option –would not prove a specific intent to injure even if we accepted the notion that he acted too quickly, which we do not. Assuming for the sake of argument that the contracting officer was too quick to believe DOL's allegations, this would merely prove that he made the wrong decision when DOL accused PSE of another SCA violation just before the deadline to exercise the option; it falls well short of demonstrating a specific intent to injure. The contracting officer did not fabricate the SCA violations, nor is there any evidence that he plotted or schemed with DOL to use the labor issues as a pretext to terminate PSE's performance or decline the options. At best for PSE, the contracting officer's decisions to decline the option and terminate Task Order No. 9 are decisions that could be second guessed if we were reviewing those actions *de novo*, which we are not. The government bargained for the right not to exercise the options and the right to terminate at its convenience. Nothing that PSE has presented to the Board persuades us that the government should be prevented from exercising its contract rights.[4]

---

[4] Because of our ruling, we have not addressed the Navy's other arguments in support of the contracting officer's actions.

11

## CONCLUSION

For the foregoing reasons, we deny PSE's motion for summary judgment and grant the government's cross-motion. ASBCA No. 58828 is denied.

Dated: 12 July 2016

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58828, Appeal of Puget Sound Environmental Corp., rendered in conformance with the Board's Charter.
Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals