ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| First Division Design, LLC | )  ASBCA No. 60049 |
| | ) |
| Under Contract No. FA5270-13-P-0131 | ) |

APPEARANCE FOR THE APPELLANT:      Mr. Craig F. Pierce
                                                                    Manager/Member

APPEARANCES FOR THE GOVERNMENT:      Jeffrey P. Hildebrant, Esq.
                                                                      Air Force Deputy Chief Trial Attorney
                                                                   Phillip E. Reiman, Esq.
                                                                   Maj Matthew Ramage-White, USAF
                                                                   Alexis J. Bernstein, Esq.
                                                                    Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE KINNER

Appellant, First Division Design, LLC (FDD), appeals the Air Force's decision to deny most of the costs FDD claims relating to the termination for convenience of its contract for floor tiles. Appellant principally contends that the Air Force is liable for delay in terminating the contract and for costs incurred during extended negotiations prior to termination. The contract was terminated because the Air Force had incorrectly accepted FDD's offer for floor tiles manufactured in China. The Air Force could not accept products manufactured in China pursuant to applicable trade restrictions.

Both parties elected Board Rule 11 disposition. The government later filed a motion for summary judgment, however, it withdrew that motion, requesting that its brief be considered as the government's Rule 11 submission.

FINDINGS OF FACT

1. The 18th Contracting Squadron, Commercial Acquisitions Flight, at the Kadena Air Base in Okinawa, Japan (KAB), issued a request for quotations (RFQ) on 6 August 2013 to procure vinyl floor tiles (app. supp. R4, tab 1). The RFQ required offers to be submitted by 30 August 2013 (R4, tab 9 at 5). The RFQ stated that an award would be made to the responsible offeror whose offer conformed to the solicitation and would be most advantageous to the government (*id.* at 6).

2. The solicitation was issued, and the subsequent contract awarded, using standard form 1449, Order for Commercial Items (R4, tab 1 at 1). The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT

TERMS AND CONDITIONS—COMMERCIAL ITEMS (JUL 2013) (*id.* at 5). Relevant portions of that clause are:

(b) *Assignment.* The Contractor or its assignee may assign its rights to receive payment due as a result of performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. [§] 3727). However, when a third party makes payment (e.g., use of the Government wide commercial purchase card), the Contractor may not assign its rights to receive payment under this contract.

....

(l) *Termination for the Government's convenience.* The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

....

(v) *Incorporation by reference.* The Contractor's representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract.

2

3. FDD made several inquiries by email regarding submission of samples and other aspects of the specification before submitting its offer (R4, tabs 2-4). A KAB contract specialist, Second Lieutenant (Lt) Dayton Gilbreath, responded to FDD's inquiries the same day (R4, tab 5 at 3-4). Mr. Craig Pierce, owner and manager of FDD, was nonetheless dissatisfied with Lt Gilbreath's responsiveness, characterizing him as inexperienced or evasive and suggesting FDD might bring a "formal protest" (*id.* at 2). It is not clear how Mr. Pierce's annoyance with Lt Gilbreath could constitute grounds for a bid protest, but that exchange prompted a response from Master Sergeant (MSgt) Chad Obermiller. MSgt Obermiller identified himself as the contracting officer and assured Mr. Pierce the KAB would do "everything in our power to get you the requested information and to assist your company in any way that we can so long as we are legal to do so" (*id.*). In a reply email on 15 August 2013, Mr. Pierce discussed his concerns with the specification and explained that the tile in the solicitation "was manufactured in China, as will be the product we offer" (*id.* at 1). Mr. Pierce also discussed sending a sample from China.

4. The KAB received eleven offers in response to the RFQ (supp. R4, tab 109). Eight offers were from American companies and three quotes were received from companies in Japan (*id.*). On 30 August 2013, FDD submitted its offer to supply tile for $341,280.00 (R4, tab 9). On 8 September 2013, MSgt Obermiller sent FDD a notice of award of the purchase order by facsimile (R4, tabs 1, 12 at 3). FDD returned its acknowledgment of the order the same day (R4, tab 12 at 3).

5. Vendor 9 on the bid abstract, OSC Solutions, filed three agency protests (R4, tab 108 at 20). Its first two protests, on 8 August and 9 September, claimed the KAB violated a requirements contract with OSC by purchasing tile from another source (*id.* at 1-3, 7-11). In the protestor's third challenge, submitted 25 September 2013, it also asserted the award to FDD was invalid under FAR 25.502(b) (*id.* at 19-25). OSC explained that FAR 25.502(b) required the contracting officer to consider only offers of U.S.-made or designated country end products in accordance with the World Trade Organization Government Procurement Agreement (WTO GPA) (*id.* at 24). The WTO GPA limitations are applicable to any supply contract exceeding $202,000.00 (*id.* at 22). Because the purchase order required the delivery of tile manufactured in China for $341,280.00, OSC concluded that the "government is required to immediately cancel the award to [FDD] and award a contract to the lowest priced technically acceptable offer meeting the applicable procurement laws" (*id.* at 24).

6. Each of the three agency protests filed by OSC were withdrawn but, before the second one was, Lt Gilbreath sent the following direction by email to FDD on 17 September 2013: "Please stop all work for contract FA5270-13-P-0131. We will have further guidance in the next 48-72 hours." (R4, tab 13) Contrary to the directions in FAR 52.233-3, which authorizes a stop-work order when the agency receives a protest, the email did not state that the stop-work order was issued pursuant to that clause, or in

3

response to the second OSC protest (*id.*) FAR 52.233-3, PROTEST AFTER AWARD (AUG 1996), provides:

> Upon receipt of a notice of protest (as defined in FAR 33.101) or a determination that a protest is likely (see FAR 33.102(d)), the Contracting Officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract. The order shall be specifically identified as a stop-work order issued under this clause.

7. There is no evidence that FDD suffered damages because the stop-work order lacked the additional language required by FAR 52.233-3, Protest after Award. To the contrary, Lt Gilbreath's stop-work order should have prevented FDD from incurring further expense in performance of an invalid purchase order. Despite Mr. Pierce's statement when acknowledging the award in an email on 9 September 2013 that "[w]e will begin immediate production this week" (R4, tab 12 at 1), FDD did not incur costs for performance of its contract between the award on 8 September and the stop-work order on 17 September. Contrary to Mr. Pierce's 17 September email response to Lt Gilbreath, after receiving the stop-work order, that "we have already begun production to meet shipping date" (app. supp. R4, tab 53 at 20), there is no evidence that FDD performed compensable tasks to support the production of tiles before the stop-work order was issued. Instead, prior to the stop-work order FDD conducted email discussions with its purchasing agent, Mountain Gear Inc. (Mt Gear), and the supplier, Mao Sheng Plastics (MSP), confirming pricing and executed an agreement to assign payment for the contract to Mt Gear (*id.* at 3-19). In the assignment of claims agreement, Mt Gear assumed responsibility for "the performance of any work of any of the items mentioned in said contract" (app. supp. R4, tab 6 at 3). Manufacturing of the tiles did not begin before the stop-work order, because Mt Gear did not forward the deposit to MSP until 16 September (app. supp. R4, tab 53 at 16).

*Work Following the Stop-Work Order*

8. Following the stop-work order, neither FDD, nor its agent, Mt Gear, or the supplier, MSP, should have started work. Pursuant to subsection (a) of FAR 52.233-3, "Upon receipt of the [stop-work] order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage" (R4, tab 111 at 8). There is no evidence of how FDD complied with the stop-work order, or the FAR direction to take steps to minimize incurrence of costs. Rather than act to comply with the order, FDD attempted to perfect the assignment of claims agreement with its purchasing agent, Mt Gear (R4, tab 8). The afternoon following the stop work message from Lt Gilbreath, Mr. Pierce sent an email to the KAB expressing concern that he had not submitted his request for the assignment (*id.*). Mr. Pierce's email appeared to disregard the stop-work order. The contracting officer's response to Mr. Pierce's request for an assignment added

4

confusion to the direction the contractor was receiving. Without mention of WTO GPA requirements, or the stop-work order, MSgt Obermiller's email stated: "The only concern I have is that we are only allowed to issue an assignment of claims to a bank" (*id.*). Acting on that statement, Mr. Pierce and the president of Mt Gear withdrew the request for assignment to clear the way for their performance of the contract (R4, tabs 14-18). But Mr. Pierce could not reasonably have believed that his interest in an assignment was the reason for the stop-work order. In his prior message, Mr. Pierce had stated the KAB had no knowledge of his assignment request before the stop-work order was issued: "Dayton & Chad, it was just pointed out to me that you were not given a notice that a 'Financial, Assignment of Claim' was to be issued" (R4, tab 8).

9. In light of the stop-work order, KAB contracting officials should have been concerned by Mr. Pierce's succeeding messages in which he referenced work that FDD should not have been performing. FDD's 23 September 2013 email to KAB states: "The boxes/cartons are being printed with your PO number and our company and description" (R4, tab 18). The 24 September email states: "We are in full production and have not heard from either of you since the 'assignment of claim,' issue" (R4, tab 19). Even if Mr. Pierce somehow believed the stop work related to an assignment to Mt Gear, he had no basis to presume the stop-work order was lifted to permit FDD to prepare shipments or engage in full production.

10. If FDD was confused, MSgt Obermiller did not clarify the reason for the stop-work order until 25 September 2013, when he asked where the plank flooring would be manufactured (R4, tab 20). Referencing FDD's prior submissions (R4, tabs 5, 9 at 4), Mr. Pierce confirmed FDD was offering a product from China (R4, tab 23). MSgt Obermiller then informed Mr. Pierce that the KAB could not complete the purchase because it would violate the listing of foreign products required by FAR 52.212-3(g)(5)(ii) Trade Agreements Certificate (*id.*). The contracting officer's statement was not entirely accurate because a purchase from FDD would not violate the requirement for the list, rather it would run afoul of the prohibition on government acceptance of goods made in China. As defined in FAR 25.003, acceptable products under the contract had to be made in the United States or a designated country in accordance with the WTO GPA. FAR 52.212-3(g)(5) gives effect to that restriction by requiring product information from a bidder, that, if necessary, would alert the KAB to an unacceptable bid to deliver products manufactured in non-designated countries, such as China. Thus, it was FDD's responsibility, pursuant to FAR clause 52.212-3, to list foreign products that it would deliver if awarded the contract.

11. Although FAR 52-212-3, OFFEROR REPRESENTATIONS AND CERTIFICATIONS—COMMERCIAL ITEMS, had been added by one of the three solicitation amendments (compl. ¶¶ 7-9), as explained below the KAB never had a chance to consider a trade agreement certification, ostensibly, from FDD (app. supp. R4, tab 2). The trade agreement certifications required by FAR 52.212-3(g)(5), are part of the offeror's verification that its representations and certifications reported on the DoD Central System

for Award Management (SAM) website are current, accurate, complete, and applicable to the solicitation (app. supp. R4, tab 3; R4, tab 9 at 6). Prior to award, Lt Gilbreath warned FDD that it would be found "non-compliant" if it had not registered with SAM (R4, tab 10 at 2). In response, FDD confirmed that it was "registered and current in SAM" (*id.* at 1). Notwithstanding that representation to Lt Gilbreath, FDD had chosen not to complete the trade certifications because the information "must be submitted to the government with individual offers/proposals" (app. br. at 13; app. supp. R4, tab 3 at 1). FAR 52.212-3 instructed FDD that its offer verified the accuracy of its representations in SAM, and that it should *"identify the applicable paragraphs at (c) through (u) of this provision that the offeror has completed for the purposes of this solicitation only, if any."* Had FDD complied with that instruction, it would have identified the product it offered as a product from China, under subparagraph (g)(5) (R4, tab 24 at 3). FDD apparently ignored that requirement (app. supp. R4, tab 3).

12. To compound that omission, Mr. Pierce claimed the clauses pertaining to trade agreements were not applicable to the solicitation or the purchase order (R4, tabs 24-27). Mr. Pierce informed the contracting officer that subparagraph FAR 52.212-3(g)(5) is prefaced with the parenthetical instruction that trade agreement certifications only apply if clause FAR 52.225-3, BUY AMERICAN – FREE TRADE AGREEMENTS – ISRAELI TRADE ACT, is included in the solicitation (*id.*) From that assertion, Mr. Pierce argued that trade agreement certifications were not required because the Buy American clause had not been included in the solicitation. Mr. Pierce's analysis was incorrect because he misstated the FAR provision referenced in FAR 52.212-3(g)(5). The clause discussed by Mr. Pierce, FAR 52.225-3, does not apply to this overseas contract. *See* FAR 25.1101(b). Thus, FAR 52.225-3 was properly excluded from the solicitation.

13. Mr. Pierce corrected his mistaken reference in a succeeding message (R4, tab 27 at 3). The clause referenced in FAR 52.212-3(g)(5) which triggered FDD's responsibility to submit a trade agreement certification is FAR 52.225-5, Trade Agreements. Mr. Pierce asserted that FAR 52.225-5 also was not included in the solicitation (*id.*). FDD was incorrect because FAR 52.225-5 is in the list of clauses that may be included in the contract by reference under FAR 52.212-5 (R4, tab 1 at 8).

14. Undaunted by the presence of the correct clause, Mr. Pierce continued emailing the contracting officer into October arguing that the KAB had incorrectly assembled the solicitation and was relying upon incorrect FAR provisions (R4, tabs 24-29). MSgt Obermiller responded to FDD's arguments and tried to address the confusion created by some of his prior messages, e.g., "[m]y response to the Assignment of Claims was unrelated to the suspension of work" (R4, tab 39 at 10). He explained that "we are still wanting to keep the contract" but the KAB had to receive a product from "a Designated Country [a]s defined in FAR 25.003" (*id.* at 7). By 4 October 2013, Mr. Pierce appeared to accept MSgt Obermiller's explanation and declared he would be able to deliver tile from a designated country very quickly (R4, tab 30). Despite that representation, Mr. Pierce continued to suggest ways to avoid the WTO GPA limitations (R4, tabs 31-35).

6

MSgt Obermiller similarly seemed determined to find a way to continue the purchase order with FDD (R4, tabs 36-39).

15. The contracting officer's expressed desire to continue the contract, apparently did not satisfy Mr. Pierce, who made unspecified threats of legal action against MSgt Obermiller (R4, tab 39). In response, the contracting officer tried to assure Mr. Pierce that he and "my legal team are doing everything that we can to make this work" (*id.*). Whatever MSgt Obermiller's motivations, he sincerely sought a means to complete the purchase order (*e.g.*, R4, tab 106 at 41). MSgt Obermiller continued email discussions with Mr. Pierce between 9 and 31 October 2013 regarding price and shipping (R4, tabs 31-42).

16. At the end of the month, Mr. Pierce informed MSgt Obermiller he was finalizing shipping details (R4, tab 43). In response, on 1 November 2013, MSgt Obermiller reminded Mr. Pierce "[w]e are still working through the WTO GPA issue" and hoped to have a definitive answer the following week (*id.*).

17. That answer appeared to come on 18 November 2013, when MSgt Obermiller informed Mr. Pierce that the KAB had made the decision that it could only proceed with procurement of goods from a "compliant country" (R4, tab 46). Mr. Pierce responded the next day (R4, tab 47). Contrary to the representation that FDD would deliver a product from a designated country (R4, tab 30), Mr. Pierce informed the KAB that a source did not exist that met the contract specification for the contract price. He instead proposed a price increase of $70,096.22. Mr. Pierce explained that a modification of the contract price would also free the government of unspecified charges, fees and legal issues. (*Id.*) Five days later, Mr. Pierce sent a follow-on email to tell MSgt Obermiller that the contract was 100% his responsibility and "you should have done your job" to apply WTO GPA to the solicitation (R4, tab 48). The email went on to speculate that possibly all the bidders "may have been non-compliant with the WTO GPA" because there was "no abstract or debriefing how you achieved your decision" (*id.*). Mr. Pierce warned the contracting officer that: "Time is up, please accept the order that is about to ship or modify the contract to increase the amount by $70,096.22, for a total of $411,376.22." Alternatively, Mr. Pierce advised the contracting officer that he could proceed with a termination for convenience and the "contracting office will be responsible for all cost, incurred by First Division Design LLC, all our subcontractors, freight forwarders, lost profit and of course legal fees." The email included a deadline in which the contracting officer was to choose a "direction" or provide contact information for the legal department, director of contracting and the base commander "and unfortunately...we must start proceedings." (*Id.*)

18. Despite its threats, FDD's position was not consistent with the facts. FDD could only have had an "order that is about to ship" if it ignored the stop-work order and the information it received in the email discussions with the contracting officer (R4, tab 8). It had been told by the contracting officer that adjusting the contract price would require re-solicitation of the requirement (R4, tab 32). And, if FDD could not provide the requirement at the contract price, the KAB would have to terminate the contract (R4,

7

tabs 23-24 at 3, tabs 28-29, 34, 46). Perhaps Mr. Pierce's correspondence ignored those circumstances because much of the contracting officer's correspondence appeared to similarly disregard the regulatory framework of the solicitation, as did MSgt Obermiller's response to Mr. Pierce's 19 November 2013 threatening email. Ignoring his prior statement that a post award change to the specification or price would require re-solicitation (R4, tab 32), the contracting officer invited Mr. Pierce to consider a more moderate price increase than that proposed by FDD (R4, tab 50). MSgt Obermiller's suggestion appears to have been based upon his belief that he could obtain KAB funding for a reformed contract at $402,000 (*id.*). Mr. Pierce declared $402,000 to be an acceptable price and MSgt Obermiller said he was working with the customer "to secure the additional funding" (R4, tabs 49-51).

19. Despite MSgt Obermiller's desire to work with Mr. Pierce, the KAB determined it could not pursue restructuring the contract. MSgt Obermiller informed Mr. Pierce by email, 20 December 2013, that completing a modification of the purchase order would violate procurement regulations (R4, tab 53). Other than to say the modification would require "negotiations with all vendors" the message did not provide the reason why executing the modification would be improper (*id.*).

20. What MSgt Obermiller's email explained, was that only two options existed in the procurement (R4, tab 53). FDD could perform, if it was able to "supply an item from a qualified country at the current contract price." Or, the KAB would terminate the contract. (*Id.*) Rather than accept the opportunity to complete the contract by delivering tiles "in accordance with the WTO GPA," as he told the contracting officer he would on 4 October 2013 (R4, tab 30), Mr. Pierce chose contract termination (R4, tab 54). Mr. Pierce also asked what regulation was being violated, and made unsupported claims that the tile FDD offered was produced and "waiting to ship for 45 days," and production was begun on a "WTO GPA product" as well (*id.*). MSgt Obermiller informed Mr. Pierce that production by FDD suppliers would have been accomplished at FDD's risk because the stop-work order had not been lifted and no modification of the purchase order had been executed (R4, tab 55).

21. MSgt Obermiller also informed Mr. Pierce that a modification would violate FAR 15.306(b)(1) (R4, tab 55). This is a peculiar reference because FAR subpart 15.3 describes the policies and procedures an agency should use for selection of a source in negotiated acquisitions. Presumably, the KAB considered a modification to revise the product and price offered by FDD a violation of that restriction. Aside from the determination that materially modifying the purchase order was impermissible, the KAB made no mention of FDD's inability to comply with the WTO GPA restrictions, which KAB said would make termination necessary.

22. MSgt Obermiller and Mr. Pierce continued to correspond by email through January 2014 (R4, tabs 56-60). In his messages, Mr. Pierce insisted the order was "on its way" and FDD had to deliver because a termination notice had not been issued (*e.g.,* R4, tab 59). Mr. Pierce also contacted the commander of the KAB contracting office,

8

Lt Col Calvin C. Hodgson, to inform him that FDD had "endured improper procedures" with this contract, and that all the errors were committed by the KAB (R4, tab 63 at 4). In reply, Lt Col Hodgson explained that cancellation of the purchase order would be pursued in accordance with FAR 13.302-4, or by termination pursuant to FAR 12.403 (*id.* at 3). Lt Col Hodgson also assigned a new contracting officer to the contract, Mr. Charles Julian (*id.*).

*Termination Contracting Officers*

23. Mr. Julian issued the termination for convenience notice 12 February 2014 (R4, tab 67). FDD submitted its initial termination settlement proposal 11 March requesting $300,844.15, based upon an invoice from Mt Gear, for $258,411.49 and $42,432.66 for unspecified administrative expenses allegedly incurred by FDD (R4, tab 69). Mr. Julian questioned whether FDD had attempted to mitigate any of its alleged costs (R4, tab 68). He also questioned Mr. Pierce's conflicting representations regarding amounts owed to the subcontractor and the supplier (*id.*). As reflected in Mr. Julian's 3 April 2014 letter, he and Mr. Pierce apparently continued discussions through March 2014 (R4, tab 71). Based upon "conversations and correspondence" with Mr. Pierce, Mr. Julian understood that the tile had been manufactured and remained stored in the manufacturer's warehouse. With that understanding, Mr. Julian recommended ways for FDD to mitigate whatever costs it had incurred by negotiating a sale of the tile. (*Id.*) He requested a response from FDD in ten days explaining "how you have mitigated or are mitigating your costs." Mr. Julian explained that the contracting officer would use that information to determine the amount to be paid to FDD. (*Id.*) FDD's 9 April 2014 response provided conflicting answers to Mr. Julian's requests (R4, tab 72). FDD informed Mr. Julian that "all contract related costs have been avoided" because the contract was terminated, and "no manufacturing or related contract costs" were incurred after the termination. But FDD could not mitigate the costs it had incurred because the KAB had employed "improper procedures." FDD claimed its purchasing agent, Mt Gear, had lost confidence in both FDD and the KAB. FDD explained that the manufacturer, MSP, would not make contact with FDD because its contract was with Mt Gear. FDD suggested this situation could have been avoided if the KAB had issued the termination "in a timely manner." (*Id.*) FDD did not explain how additional expenses could have been avoided or reduced by a "timely" termination notice when FDD was restricted from incurring costs beginning 17 September by the stop-work order.

24. Rubyann Prout, Director of Business Operations, for KAB informed FDD by email on 5 May, that she was assuming responsibility for the termination settlement (R4, tab 77 at 4). Ms. Prout referenced Mr. Julian's prior discussions regarding FDD's costs and assured Mr. Pierce the KAB wished to close out the matter once it received FDD's claim (*id.*). Mr. Pierce informed Ms. Prout that Mr. Julian's suggestion that FDD sell the tile was "not viable" because a bank would not offer a loan on the "specialized inventory—without a billable invoice" and a distributor would not stock that amount of tile (*id.* at 1). Mr. Pierce provided calculations presumably to show the resale price

9

exceeds the value of the tile plus shipping cost. He also attached a somewhat revised settlement proposal for $307,320.32. (*Id.*) Mr. Pierce did not explain why FDD would be concerned with a bank loan for the tile inventory if it was selling the product. Nor did he explain why a distributor would not stock the amount of tile in the contract, much less portions of the contract amount. Nor, did Mr. Pierce provide support for these assumptions from the market, or explain the basis for these assumptions.

25. Ms. Prout sent Mr. Pierce a memorandum on 9 May 2014 requesting documentation to support FDD's settlement proposal (R4, tab 78). Ms. Prout noted that FDD's proposal was unusually high in light of the stop-work order issued 17 September. and, without a settlement with Mt Gear, FDD's only costs were the $2,600 it had identified as termination costs (*id.* at 2). Ms. Prout posed seven questions seeking an explanation of specific cost items in FDD's proposal and specific facts regarding the actions of FDD and Mt Gear (*id.*). First FDD was asked what costs it included in the $43,432.66 it labeled "initial costs" in its latest proposal (R4, tab 79). FDD's response was that $43,432.66 was the total cost, (excluding "reasonable profit") incurred for a list of "bullet items" (*id.*). The bullet items are a list of generic terms, such as "costs incurred in performance," "price preparation for Korea (as per MSgt Obermiller)," and "research fees" without associated dollar amounts (*id.* at 1). Ms. Prout asked how FDD calculated the $2,600 identified as "costs of termination settlement" in its first proposal (R4, tab 78). FDD responded that it added that number to its settlement costs "for administrative, legal and consulting fees—for answering redundant questions which have been answered previously" (R4, tab 79 at 1). Administrative and legal fees were included in the generic list of terms in FDD's response to the first question as well (*id.*). In response to Ms. Prout's question what was done after receipt of the stop-work order, FDD would only state that it did not receive the termination for convenience notice until 12 February 2014 (*id.* at 2). FDD added "Clarification: 'Stop Work Order' applies only to construction contracts. You should know this?" (*Id.*) FDD was presumably arguing a stop-work order could not have been issued based upon its reading of the text of the fixed-price termination for convenience clause, FAR 52.249-2, which it reproduced in its response, noting that the clause specifically includes the words "Stop work." Lastly, in response to Ms. Prout's question what amount FDD paid or was obligated to pay Mt Gear, FDD responded: "$262,287.66 at present." (*Id.*)

26. Mr. Pierce's posturing was not responsive to the specific questions posed by Ms. Prout. She reiterated her questions in a second memorandum on 14 May 2014, explaining the importance of mitigating costs with Mt Gear, and warning FDD that it would only be paid for costs it actually incurred (R4, tab 81). Ms. Prout noted that "[w]e are not in a position to appreciate fully your relationship with Mt Gear nor its relationship with the manufacturer" (*id.*). Ms. Prout told FDD that it should follow the claim process in FAR 33.207 when it was ready to file a claim (*id.*). Without responding to the questions in the 14 May memorandum, on 22 May 2014, FDD re-sent its response to the 9 May memorandum, and its response to the questions posed in Mr. Julian's 18 March request (R4, tab 82). But Mr. Pierce also said he would supply Ms. Prout with a revised

10

Settlement Proposal the following day (*id.* at 1). The KAB did not receive that proposal from FDD. On 10 July 2014, Ms. Prout sent a memorandum again asking for clarification of FDD's alleged costs (R4, tab 84). Ms. Prout also advised how FDD could submit a claim and provided the language for claim certification (*id.*). Notwithstanding Ms. Prout's reiteration of the regulatory basis for the stop-work order in her several memoranda, Mr. Pierce responded with a demand that the KAB provide him those regulations, presumably seeking either the same citations or reproduction of the text of applicable FAR provisions (R4, tab 85). Mr. Pierce asked for these regulations because "I will not allow you to 'sweep under the carpet', the delayed and improper procedure regarding this contract" (*id.*).

27. On 15 July 2014, Mr. Pierce informed Ms. Prout that he expected "a revised, signed and certified modification of billing from MT Gear to FDD" (R4, tab 86). That modified billing is presumably the 31 July 2014 invoice from Mt Gear included in appellant's supplement to the Rule 4 file although there is no evidence it was provided to the KAB (app. supp. R4, tab 19). The invoice included: a prepaid non-refundable deposit, $52,518.45; margin on manufacturers non-refundable amount, $34,874.73; anticipated job profits (incurred costs included), $62,469.27; interest on prepaid deposit at 5.25% for 12/15/13 – 8/15/2014, $1,835.63. The invoice does not include an explanation how FDD would be liable to Mt Gear for the amounts for margin, anticipated profit or interest on the deposit, even assuming there was a subcontract relationship between FDD and Mt Gear.

28. The KAB had not requested an invoice from Mt Gear, rather it sought documentation of FDD's obligation to pay such an invoice. Lacking substantive responses from FDD, the KAB continued email correspondence through August 2014 regarding FDD's position that a valid stop-work order had not been issued, and the KAB's request that FDD submit a claim to bring the termination settlement to a close (R4, tabs 87-92).

29. FDD nonetheless maintains these arguments in its claim (R4, tab 96 at 2); and before this Board (app. br. at 15, 23). Mr. Pierce certified FDD's settlement claim 1 February 2015 (R4, tab 96 at 10). Ms. Prout, acting as contracting officer, denied the majority of FDD's termination for convenience claim by final decision 22 April 2015 (R4, tab 98). The contracting officer determined that FDD was entitled to $11,944.99 for some work performed and settlement related costs (*id.* at 11). On 1 July 2015, Mr. Pierce notified Ms. Prout that FDD had filed a notice of appeal with this Board (R4, tab 99). He also requested payment of the amount granted in the final decision (*id.*). Ms. Prout informed Mr. Pierce that FDD's request for payment had to be made through the process in the Wide Area Work Flow clause (R4, tab 100). A modification was issued to the contract for $11,944.99, which was paid to FDD on 4 August 2015 (R4, tabs 101-02).

*The Subcontractor and Supplier*

30. In October 2013, Mr. Pierce had contacted other suppliers looking for a company that could supply a conforming product from a designated country (R4, tab 106 at 2-3, 6, 8-9). Among others, Mr. Pierce contacted the Top-Joy International Trading (Shanghai) Co., Ltd. which manufactures flooring. Mr. Eric Zeng of Top-Joy responded "we don't have manufacturing plant for vinyl plank in WTO GPA country." (*Id.* at 22)

31. In his 9 April 2014 revised settlement proposal, Mr. Pierce unequivocally asserted to Mr. Julian, that FDD had no contractual relationship with MSP (R4, tab 72). He insisted MSP would not communicate with FDD without a contractual relationship (*id.*). Yet, there had been a continuous stream of email communication between Mr. Pierce and Alex Lu, representative of MSP. The evidence of Mr. Pierce's communication with Mr. Lu revealed Mr. Pierce did not inform MSP of the stop-work order. (R4, tab 106 at 4-6) Rather, it was Mr. Lu who informed Mr. Pierce on 9 October 2013, that "mass production" was suspended when MSP received "advice of cancellation." Despite that suspension of work by MSP, on 16 October, Mr. Lu informed Mr. Pierce that "we made all 14400 cases vinyl flooring." MSP also apparently intended to continue work. (*Id.* at 9) On 28 October, Mr. Lu informed Mr. Pierce "It has been 40 days since our contract # MS130910 come into effect. I am afraid that we have to terminate this contract by the deadline of 18, Nov., 2013. However, we hope to finish this contract before the deadline." (*Id.* at 24)

32. Despite his contacts with Mr. Lu, Mr. Pierce expressed to MSP confusion regarding MSP's progress with the work. Mr. Pierce asked Mr. Lu on 30 October 2013, 43 days after MSP should have been instructed to cease work and ensure no further costs were incurred, "What is the production status? One e-mail states 5000 cases packaged, another says all 14,400 are finished. Which is it. Cases produced at this time?" (R4, tab 106 at 27) According to Mr. Lu, Mr. Pierce's confusion was due to his references to different parts of the product: 5,000 square meters of tile had been finished, all 14,400 paper cartons had been finished and the film used in manufacture of the tiles had been made (*id.*). Mr. Pierce attempted to convey that breakdown to MSgt Obermiller in his 18 November email:

> We must offset MS Flooring's cost of the pvc, film, customized boxes, inspections and freight forwarders, for the initial order from China, as specified in our bid response and still make a profit. A modification adding $70,096.22 to the contract will allow a very modest profit, without a loss. This will free the US Gov't of any additional charges, fees or legal issues.
>
> At present we favor a factory out of Taipei. All sea cargo will be US Flagged, and all the proper documentation will

12

be supplied. Documentation to include all current Japan/US Import & Export mandates, manufacturing origin, material contents, WAWF requirements and mandatory freight documentation.

(R4, tab 106 at 39) The shipping plan Mr. Pierce offered in that email reflected the plan discussed with Mr. Lu, to falsely deliver the MSP non-compliant products via Taipei (*id.* at 27). Perhaps, Mr. Pierce was attempting to increase FDD profits by making the false shipment under the purchase order.

33. Mr. Lu informed Mr. Pierce that work on the order would be suspended temporarily on 14 November 2013, 58 days after the 17 September stop-work order (R4, tab 106 at 36). The costs MSP incurred after the stop-work order were not the responsibility of the KAB. Instead, on 2 December, FDD's supplier encouraged Mr. Pierce to find another customer for the tile to mitigate the loss of the deposit that MSP would retain (*id.* at 42). Mr. Lu's recommendation was similar to the advice Mr. Pierce had received from Mr. Julian and Ms. Prout. Mr. Lu's recommendation to sell the tiles conflicts with Mr. Pierce's statements to Mr. Julian. Mr. Lu also stated that it would be difficult to sell a large volume of single color custom made deco film (*id.*). That information from Mr. Lu was very different from Mr. Pierce's assertion to Mr. Julian that it would be difficult to re-sell the completed tile.

34. Contrary to his statements to the contracting officers in April 2014 that he had no contractual relationship with MSP, Mr. Pierce pursued settlement with Mr. Lu in December 2013. According to a summary of emails that FDD submitted for this litigation, Mr. Pierce asked for delivery of the completed tile, cartons and film (R4, tab 106 at 44). Also contrary to Mr. Pierce's statements, Mr. Lu explained that no money was owed to MSP, and a refund was due on the deposit MSP received from Mt Gear (*id.*). Because MSP's total production cost for completed tiles, $7,227.80, finished cartons, $5,579.69, and unused film, $38,057.29, totaled $50,864.78, Mt Gear could recover a refund of $1,653.67 (Deposit, $52,518.45 – Production cost, $50,864.78 = Refund, $1,653.67) (*id.* at 44-45). MSP's total production cost equaled 15 percent of the KAB purchase order price.

35. Also contrary to his April 2014 representations to Mr. Julian, Mr. Pierce discussed selling the completed tiles in the United States in December 2013 (R4, tab 106 at 47). The owner of Mt Gear asked Mr. Pierce if he could help sell the flooring in MSP's possession. Mr. Pierce responded that he had discussed sale of the tile with a potential distributor. "Talked with Philip the vinyl flooring distributor from Ohio. He suggested selling it to the flooring distributors here in the Inland Empire." (*Id.*) The distributor did not raise any of the concerns Mr. Pierce described to Mr. Julian as reasons the flooring could not be sold to mitigate FDD costs (*id.*).

13

*Settlement Claim*

36. In its claim, FDD asserts it "endured extreme economical duress" as a result of the improper award of the purchase order (R4, tab 96 at 1-2). The untimely termination of the contract added to that duress. FDD divides the costs to be recovered between FDD and Mt Gear. Costs claimed for FDD include estimated hours expended by Mr. Pierce: 38.5 hours between 5 and 30 September 2013, $5,875; 46 hours between 30 September 2013 and 12 February 2014, $6,900; 161 hours for settlement preparation costs between 12 February and the date of the claim, $24,150; and 29 hours for termination settlement costs with Mt Gear, which consisted of "mitigation, legal, financial, research & admin fees," $4,350. (*Id.* at 3) The dollar total for each period was derived from a presumed hourly rate for Mr. Pierce of $150. Added to Mr. Pierce's hourly labor costs were $13,500 for amounts paid to Strategic Sourcing Consultant; and $59,035 for one third of FDD's anticipated profit of $88,642.12. FDD's claimed costs total $113,810. Mt Gear's costs of $151,698.08 include the non-refundable deposit to MSP, interest on the deposit, costs for "accounting, clerical, administration, research & legal fees preparatory & termination expenses." (*Id.*) FDD included 33 pages of documents as the support for the total claim of $265,508. The documents include copies of email correspondence between Mr. Pierce and the KAB. (*Id.* at 4-7, 11-38) Also included is an invoice for Strategic Sourcing Consultant and a statement from Mt Gear (*id.* at 8-9). None of the documents are records relating to Mr. Pierce's compensation and none explain the tasks listed in any claimed time period. There is no evidence that FDD employs a standard record keeping system or that its alleged costs were maintained in such a system. There is no record or explanation of the relationship between FDD and Mt Gear, nor of the amounts on Mt Gear's statement.

37. After this appeal was filed, government counsel requested assistance from DCAA in the evaluation of FDD's claim (R4, tab 105 at 1). DCAA did not conduct an audit (*id.*). DCAA collected information from FDD regarding its discussion with Mt Gear about resale of the tile (*id.* at 5). DCAA concluded that FDD had an opportunity to reduce or avoid the cost of the tile by accepting the product and reselling it to another customer (*id.*). DCAA reviewed the cost elements of the claim and concluded that FDD does not utilize a standard record keeping system or possess records to support the claimed costs (*id.* at 6-17). FDD has no record of payment to Mt Gear for the deposit to MSP (*id.* at 7). FDD could not produce a contract with Strategic Source Consultant, or any work product from the consultant, which was described by FDD as "not well versed in government sales" (*id.* at 13-4).

## DECISION

The government improperly awarded the purchase order to FDD for goods unacceptable under the WTO GPA. Arguably, the contracting officer did not have authority to make an award to FDD because its offer was non-responsive to the solicitation. FAR 14.408-1(a)(3); *Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245 (Fed. Cir. 2002) (Contracting officer is not authorized to deviate from requirements

of procurement regulations, any deviation is beyond authority of the contracting officer.). The failure of a contracting officer to comply with statutory requirements in making an award can render the contract a nullity. *United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed. Cir. 1986). The award may be canceled without liability to the government if the KAB made the award contrary to the trade agreement regulations as a result of FDD's actions, or if FDD was on direct notice that the procedures being followed were violating those requirements. *Id.* at 393 (citing *Prestex, Inc. v. United States*, 320 F.2d 367, 373 (Ct. Cl. 1963); *Schoenbrod v. United States*, 410 F.2d 400, 404 (Ct. Cl. 1969); *Toyo Menka Kaisha, Ltd. v. United States*, 597 F.2d 1371, 1376–77 (Ct. Cl. 1979)).

Contrary to FDD's insistence that every error in the solicitation and award of the purchase order was the responsibility of the KAB,* it ignored the applicable trade restrictions for this contract (finding 12). It also incorrectly asserts "[n]owhere in the FFP contract was there any reference (language or legal citation) to World Trade Organization – Government Procurement Agreement compliance requirements" (app. br. at 2, 12). Other offerors appear to have understood that only products from the United States or a designated country would be acceptable. At least one other offeror recognized that an award to FDD violated regulations, because the WTO GPA restricted this procurement to

---

* The government nonetheless asserts the stop-work order was issued pursuant to that provision (gov't br. at 3, ¶ 7; R4, tab 98 at 1). FDD argues that the stop-work order was invalid because the contract does not contain a stop-work clause and Lt Gilbreath did not possess authority to issue such an order (app. br. at 4; app. reply br. at 5). FDD also argues that the 17 September stop-work order was improperly issued because it was in response to the earlier protest, that was based upon the protestor's requirements contract, not the 25 September protest which argued FDD's offer was unacceptable because the tile would be manufactured in China (app. br. at 5; app. reply br. at 4-5). Neither of FDD's exceptions to Lt Gilbreath's email invalidate the stop-work order. Despite the technical deficiencies in the text of the order, the KAB had issued a stop-work order in substantive compliance with FAR 52.233-3. FAR 52.233-3 was incorporated by reference under FAR 52.212-5, CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS—COMMERCIAL ITEMS (AUG 2013) (R4, tab 1 at 1, 5). The contract specialist issued the stop-work order in response to a protest. FDD had no reason to assume the contract specialist was acting outside his authority or without direction from the contracting officer. Lt Gilbreath was identified in the RFQ as the primary point of contact for the solicitation (app. supp. R4, tab 1 at 3). Lt Gilbreath's email was an explicit direction to FDD to cease contract work. That direction was no less explicit because information required to be included in the order, FAR 52.233-3, was missing. Regardless that the protestor later withdrew the protest, or submitted another more applicable protest, at a minimum, FDD was obligated to comply with the order until questions concerning its validity were resolved.

products manufactured in the United States or a designated country. (Finding 5) FDD should have known of that restriction because it received the amendment of the solicitation incorporating FAR 52.212-3(g)(5)(i), which required a trade agreement certificate for this contract (finding 11; R4, tab 27 at 2). FDD informed the contract specialist that it had completed the certifications required in the SAM, but it did not supply a Trade Agreement Certificate (R4, tab 27). The contracting officer explained that, if FDD had completed the trade agreement certificate, the KAB would have known FDD was offering an unacceptable product from a non-designated country (R4, tab 32 at 3).

That may be true, but the contracting officer did not need to rely on a Trade Agreement Certificate to identify the country of origin for the tiles FDD promised to deliver. FDD had explicitly informed the KAB in its bid, by email, and with delivery of samples from China, that the tiles it offered would be manufactured in a non-designated country (finding 3). The contracting officer acknowledged as much (R4, tab 32 at 3). ("I understand that the government should have been able to conclude that the item was coming from China, thereby we accept a portion of the blame."). Having made the award, explored ways with the contractor to avoid the WTO GPA requirement, and terminated pursuant to the terms of the contract, the government did not consider the contract illegal or a nullity (findings 4, 25). To be null, illegality must be plain, and if a succession of contracting officers believed the contract to be valid, the illegality of the agreement was not so obvious as to "impose the binding stamp of nullity" on the agreement. *Accord Honeywell Int'l, Inc.*, ASBCA No. 57779, 13 BCA ¶ 35,380 at 173,612.

FDD also considered the purchase order to be a binding agreement, but blames government contracting officials for the errors that continued the contract until the February termination (app. br. at 33-35). There is far less significance to those errors than FDD assumes. Fault is an irrelevant consideration in a termination for convenience. FAR 12.403(b). A termination-for-convenience is authorized whenever the contracting officer determines that it is in the best interests of the government. *John Reiner & Co. v. United States*, 325 F.2d 438, 442 (Ct. Cl. 1963). Whether the contracting officer's determination arises from changes to the government's requirements or from a government mistake, as the case here, those reasons generally have nothing to do with the termination settlement costs due the contractor, because the government has the right to terminate at will. *Id.* In the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive. *Id.* A failure to follow the procedures of the FAR (except, possibly, with respect to the termination itself) does not broaden FDD's rights of recovery. *Id.* at 444. FDD has not shown that it has been injured by the failure to pursue FAR procedures in the award or the issuance of the stop-work order and such mistakes are immaterial to FDD's recovery. *Id.* Contrary to FDD's arguments, none of the KAB's technical errors, real or perceived, caused FDD to incur additional termination costs (app. br. at 27).

FDD nonetheless relies upon alleged errors by the KAB to support accusations that the KAB acted with bad faith (app. br. at 5 n.1, at 22 n.2, at 36-37) and breached the

16

duty of good faith and fair dealing (app. br. at 10, 36). FDD argues that it received bad direction from the KAB termination contracting officers and DCAA (app. br. at 10, 27; app. reply at 8). FDD makes no attempt to identify the improper guidance it allegedly received from the KAB (app. br. at 9). To the contrary, "FDD continued to negotiate for months" (*id.* at 18). And, FDD failed to follow the advice it did receive, encouraging it to submit a claim (finding 30). None of the contracting officers asked for anything beyond that expected in a commercial item termination. Whatever significance there is to the parties' pre-claim discussions, FDD has not identified recoverable costs from its long delay in submission of its claim.

FDD's complaints regarding the DCAA audit are similarly hollow especially since DCAA was only involved after the appeal was filed. DCAA did not conduct an audit (finding 42). Even if it was advised that the KAB wanted that assistance, FDD voluntarily discussed its claim with DCAA representatives. Mr. Pierce consistently argued to the KAB, and in its briefs, that termination of a commercial items contract employs different procedures than a standard termination for convenience (*e.g.*, app. reply br. at 6). It is implausible that Mr. Pierce did not understand that FDD did not have to agree to work with DCAA. And, FDD relies upon the results of the DCAA audit in its brief. (App. br. at 29) FDD was not damaged by DCAA's participation (*id.* at 8). FDD similarly complains that the KAB relied upon financial principles described in FAR 49.002 to determine potentially recoverable costs for FDD (app. reply br. at 7, 9, 12; R4, tab 98 at 9). Although not intended to govern termination of commercial item contracts, FAR subpart 49 provides administrative guidance which may be followed by an agency unless it is inconsistent with the requirements and procedures in FAR 12.403, and the clause at FAR 52.212-4. The KAB did not employ concepts in conflict with commercial item contracts, but appropriately sought FAR guidance to evaluate FDD's poorly documented claim.

FDD argues that the KAB failed to adhere to a duty to cooperate (app. br. at 36). Whatever mistakes or errors FDD suffered, even if due to incompetence of government personnel, do not reflect a failure to cooperate. Mr. Pierce voluntarily participated in extended discussions with MSgt Obermiller as they hopelessly pursued a means to avoid the WTO GPA restrictions. If anything, MSgt Obermiller's error was his attempts to cooperate with FDD to continue the contract. FDD's contrary argument, that its attempts to arrive at quick and fair settlement were thwarted by the KAB, reflects nothing more than its dissatisfaction that the KAB eventually refused to entertain alternatives to compliance with the WTO GPA. That can hardly be said to be lack of cooperation with the contractor. Even if "FDD...does not understand why the contract was not Terminated by Convenience once the 18CON realized its error, instead of delaying FDD, for over five months" (app. reply br. at 4), the discussions with the contracting officer did not increase FDD's costs.

We need not consider these arguments regarding duty to cooperate further because they lack any evidentiary support and were not presented in FDD's claim. *Military Aircraft Parts*, ASBCA No. 60290, 16-1 BCA ¶ 36,257 at 176,884 (Independent claims are

not necessarily merged into the termination of the same contract under which the claim arose and may be appealed separately from the termination for convenience appeal.).

FDD's termination settlement claim appears to raise two other issues. First, FDD asserts it suffered duress from the inappropriate award of the purchase order and untimely termination of the contract. (Finding 41) FDD fails to identify how, either the award or the later termination of the purchase order, caused economic duress, much less identify any economic damages suffered as a result of such duress. A claim of duress requires proof that FDD's assent to an action was not voluntary, and that it was procured by an act of the government which violated "notions of fair dealing by virtue of its coercive effect" and allowed no alternative. *West Electronics, Inc.*, ASBCA No. 34976R, 99-1 BCA ¶ 30,337 at 150,024 (citing *Systems Technology Associates, Inc. v. United States*, 699 F.2d 1383, 1388 (Fed. Cir. 1983)). FDD did not show these elements for either the award of the purchase order or its termination. FDD chose to accept the award and chose termination when it was unwilling to deliver a product from a designated country. There are no facts showing coercive action of the government violating notions of fair dealing. To the contrary, FDD complains that the government should have terminated its contract sooner (app. br. at 37). Alternatively, FDD argues that the government insisted on either termination or delivery from a designated country, which it could not perform within the contract price (app. reply br. at 5-6). The fact that FDD was faced with two unpleasant alternatives does not make its decision any less voluntary; FDD made an informed choice. *Covington v. Dep't of Health & Human Servs.*, 750 F.2d 937, 941-42 (Fed. Cir. 1984). Mere stress of business conditions will not constitute duress where the government is not responsible for such conditions. *Program & Constr. Mgmt. Grp., Inc.*, ASBCA No. 47048, 94-3 BCA ¶ 27,127 at 135,226. FDD's position is further undermined by its internally conflicting arguments. It argues that the contracting officer "expected FDD to perform the contract and expected FDD to perform the non-WTO contract as though it were a WTO compliant contract" (app. br. at 6), but also acknowledges that the KAB could not "ignore the WTO law" and that the KAB "should have Terminated the Contract for Convenience" "immediately upon finding its mistake" (*id.* at 36).

FDD's second claim is similarly undermined by conflicting arguments. FDD claims its performance was delayed by email communications from KAB officials (finding 41; app. br. at 7, 18-20, 22-26). Its assertion of delay directly conflicts with its acknowledgement that the KAB could not accept the product it offered (app. br. at 22-26). Allegations of delay are therefore misplaced, because the work was halted by a stop-work order that could not be lifted. In order to receive compensation, whether time or money, from a delay in performance, a contractor must prove the delay was caused by the government and establish its effect upon performance. *Trepte Construction Company*, ASBCA No. 38555, 90-1 BCA ¶ 22,595. Notwithstanding the stop-work order, FDD was free to continue work any time it intended to deliver a WTO acceptable product. FDD is unable to identify additional time or cost caused by the alleged delay. Mr. Lu informed Mr. Pierce that Mt Gear's deposit covered all of MSP's costs (finding 37). FDD has supplied no evidence of costs it incurred, much less Mt Gear

18

or MSP, for workers in standby waiting to produce and deliver a compliant product. Because the contracting officer did not possess authority to accept delivery of the product offered by FDD (findings 20, 22; app. br. at 37), there was no work delayed and nothing was produced or delivered by FDD.

In its Rule 11 brief, FDD re-characterizes its termination settlement claim as two prongs under FAR 12.403(d)(1) which governs compensation for termination for convenience of commercial items contracts (app. br. at 28). Its calculations under the two prongs are substantially different than the amounts in its claim (*compare* R4, tab 97 at 4, *with* app. br. at 29-30). FDD's reformulation of the claim is based on its later developed understanding of Board precedent (app. br. at 30; app. reply br. at 8). Our cases have interpreted the entitlement formula in FAR 52.212-4(1) of a commercial items contract to be the mandatory method to determine fair compensation in a convenience termination, using actual rather than estimated costs. *Dellew Corporation*, ASBCA No. 58538, 15-1 BCA ¶ 35,975 at 175,782. Specifically, the termination settlement amount recoverable by a contractor is defined in the third sentence of FAR 52.212-4(1) which provides:

> Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.

The first prong of that clause allows FDD to receive a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination. As reflected in its "manufacturing production schedule" chart, FDD calculates that the percentage of the work performed prior to termination equates to $277,716.58 (app. br. at 30). The chart misstates the percentage of work performed before the stop-work order, because only MSP performed work related to the production of tiles, and none of it prior to the stop-work order (finding 8). Even if MSP performed work before the stop-work order, MSP's cost is not recoverable by FDD. Mr. Pierce informed the KAB contracting officer that FDD did not have a contract with MSP (finding 23). MSP was contracted to produce tiles by Mt Gear, apparently as purchasing agent for FDD (app. reply br. at 8). But FDD has not established that it entered a contractual agreement with Mt Gear. Rather than produce such an agreement, FDD relies upon the FAR provision regarding partnering to support its contention that it is indebted to Mt Gear. (*Id.*) That regulation merely recognizes that a prime contractor may enter an agreement with another company for it to act as a subcontractor. FAR 9.601. FDD did not offer any documentation of its alleged relationship with Mt Gear. Thus, even if work had been authorized, there is no evidence of FDD's liability for costs incurred by Mt Gear or MSP, or any obligation for Mt Gear or MSP to supply the manufactured tiles to FDD. The only "contract performance" that occurred prior to the stop-work order was internal email

19

discussions between FDD, Mt Gear, and MSP. Between 8 and 17 September 2013, manufacturing work was not performed. (Finding 8) The stop-work order effectively terminated the contract, because no work was authorized following the stop-work order, up to the issuance of the termination notice. FDD therefore recovers nothing under the first prong and is limited by the plain language of FAR 52.212-4(1) to recovery under the second prong. *SWR, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35,832 at 175,232.

FDD claims $379,751.28 as termination expenses under prong 2 of the termination clause (app. br. at 29). Costs recoverable under prong 2 of FAR 52.212-4 are settlement expenses and costs resulting from the termination. *Dellew*, 15-1 BCA ¶ 35,975 at 175,783. These actual costs were required to be adequately documented to the satisfaction of the KAB (finding 2). Ms. Prout worked diligently to find amounts in FDD's claim that were sufficiently supported to allow payment to FDD (R4, tab 98). Her effort to construct support for an amount that FDD should recover goes too far. However, findings of fact by a contracting officer are not binding in any subsequent judicial proceeding. *TPI Int'l Airways, Inc.*, ASBCA No. 46462, 96-2 BCA ¶ 28,373 at 141,695 (citing *Melvin Wilner d/b/a Wilner Construction Co. v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994)). A judicial proceeding following a contracting officer's decision proceeds *de novo*, which precludes reliance upon the contracting officer's decision. *Id.* Once an action is brought before the Board, the parties start with a clean slate. *Id.*

An unsupported claim document that is submitted by a party seeking money is not proof of the claim that the party asserts. *SWR,* 15-1 BCA ¶ 35,832 at 175,230 (citing *Roberts Int'l Corp.*, ASBCA No. 15118, 71-1 BCA ¶ 8869 at 41,221; *accord Industrial Refrigeration Service Corp.*, VABCA No. 2532, 91-3 BCA ¶ 24,093 at 120,594 (mere allegations are insufficient to satisfy proof burden)). Instead of documentation of actual costs from a standard record keeping system, FDD offers only vague estimates of time Mr. Pierce spent sending emails. Although FDD certified its claim, its cost calculations are unsworn allegations. As established in *SWR*, testimony of costs incurred without support from the contractor's standard record keeping system, is not sufficient to find recoverable costs. *SWR,* 15-1 BCA ¶ 35,832 at 175,230. FDD's allegations are far less reliable. As in *SWR*, reliance upon such evidence contravenes the express language of the convenience termination clause of FDD's contract. *Id.* Under the clause, a contractor is entitled to payment of charges it can "demonstrate to the satisfaction of the Government using its standard record keeping system," not any charges asserted under oath by a company official, much less mere allegations. *Id.* (citing *Industrial Refrigeration Service*, 91-3 BCA ¶ 24,093 at 120,594 (comprehensive documentation complying with cost principles will not be required, but contractor must meet burden of proving costs were incurred)).

FDD cannot recover the $151,698.08 claimed as a debt to Mt Gear (app. br. at 29, item A). FDD alleges it incurred this debt from the termination of the purchase order based upon its teaming agreement with Mt Gear (app. reply br. at 6-7). As noted above, there is no evidence that FDD has entered a teaming agreement with Mt Gear or that it is responsible to Mt Gear for this amount. Nor can recoverable costs be found in the cost

breakdown provided in Mt Gear's invoice. (App. supp. R4, tab 19) There is no evidence that FDD has paid Mt Gear for its $52,518 deposit to MSP, or is otherwise indebted to Mt Gear. There is no explanation of the $34,875 for "margin on deposit" requested by Mt Gear, or why FDD is responsible for that amount. The $62,469 of anticipatory profit for Mt Gear's potential work is an unallowable cost. FAR 49.108-3. (*Id.*) There is no basis upon which the KAB should pay FDD interest upon a deposit paid to a supplier. FAR 33.208. In addition, it is unclear whether the price of the completed tiles was recovered through sale of the floor tiles as planned by Mt Gear (finding 38). FDD does not acknowledge that MSP was fully compensated for its work, or that a refund was due on the deposit MSP received from Mt Gear.

FDD may not recover $59,838.66 as profit (app. br. at 29, item B). In SWR, the contractor recovered profit on its fair compensation, but not upon settlement expense or indirect costs. *SWR*, 15-1 BCA ¶ 35,832 at 175,233. The contracting officer awarded FDD $406.30 of its claimed profit to reflect the portion of the amounts FDD claimed for work between 30 September 2013 and 12 February 2014, and for settlement preparation costs which she found FDD reasonably demonstrated to her satisfaction (R4, tab 98 at 10). FDD could not have incurred costs to perform the contract during that time period, because it was instructed not to perform or incur costs after 17 September. Mr. Pierce's efforts between 17 September and 12 February were entirely indirect costs directed towards settlement, either offering the KAB alternatives to reform the contract or performing "legal research, financial, FAR/DAR research & admin fees." (R4, tab 97 at 4) FDD has not shown that it incurred costs in connection with the terminated work. Nor has it provided a breakdown of Mr. Pierce's work to permit allocating profit to the portion of his time devoted to "preparing to perform terminated, unperformed contract work." *SWR*, 15-1 BCA ¶ 35,832 at 175,233.

FDD may not recover the amount of the loan it received from Mr. Pierce (R4, tab 105 at 9). FDD claims Mr. Pierce provided a loan which was divided into $46,958.88 for each of the four KAB contracts FDD was performing at that time (app. br. at 30, item C). That amount is neither an expense nor a debt incurred by FDD for performance of the contract. The cost of financing performance of a contract is unallowable. FAR 31.205-20.

FDD asserts it is entitled to payment for Mr. Pierce's estimated labor hours during the time between award of the contract and the date of termination (app. br. at 29-31, items D-H; R4, tab 97 at 4). FDD similarly seeks payment based on Mr. Pierce's estimated labor hours for his work related to settling with Mt Gear (app. br. at 29, 31, item I). FDD uses $150 per hour to calculate the amount claimed for Mr. Pierce's labor (app. br. at 29; R4, tab 97 at 4). FDD relies upon rates established by the Bureau of Labor Statistics to formulate an approximation of Mr. Pierce's compensation. These costs are without support from a standard record keeping system. They are unrecoverable because the termination settlement claim should be based upon actual costs. *Dellew,* 15-1 BCA ¶ 35,975 at 175,782. FDD has not provided the Board any documentation to support the $150 per hour

21

labor rate used in the claim (R4, tab 105 at 10-12). FDD has no documentation of Mr. Pierce's rate of compensation because he is not paid a salary (app. br. at 30 n.6). Mr. Pierce takes compensation from the profit earned by FDD (R4, tab 105 at 11). FDD also has no documentation of the time expended by Mr. Pierce. Instead, FDD relies upon collections of email traffic during these periods to show the work performed by Mr. Pierce. (App. supp. R4, tabs 52-56) The email records may show that Mr. Pierce spent time communicating with KAB officials and others. They do not, however, reflect hours recorded in a standard record keeping system, nor provide support for the labor rate applied to the hours assumed by FDD. *Campus Management Corporation*, ASBCA Nos. 59924, 59925, 17-1 BCA ¶ 36,727 at 178,875 (testimony under oath by a company officer without any documentation does not suffice to prove costs).

FDD claims $13,500 for the consulting work of Strategic Sourcing Consultant (SSC), and $1,639.96 for travel expenses (app. br. at 29, items J, K, at 32). FDD has no record of an agreement with SSC, because, according to Mr. Pierce, the agreement was verbal (R4, tab 106 at 13). The only record of any work performed by SSC is Mr. Pierce's summary of his discussion with Mr. Rudd, as told to DCAA (R4, tab 105 at 13). They discussed general topics related to the contract or FDD's claim Mr. Rudd made a "suggestion for filing the Final Settlement." He also provided consulting firm recommendations. Mr. Pierce summed up SSC's credentials as "not well versed in government sales," excellent research abilities and cheaper than "the $500 per hour rates" of lawyers. (*Id.*) FDD supports its claim with an invoice (R4, tab 97 at 9). On its invoice, SSC billed FDD for 30 hours work reviewing the contract, 30 hours work reviewing correspondence between FDD and the KAB "applicable to TOC" and 30 hours work reviewing regulations pertaining to settlement proposal preparation (*id.*). The conversation described by Mr. Pierce does not support the 90 hours reported in the invoice. Without documentation of an agreement, work product or the meeting, these charges are unrecoverable. *SWR*, 15-1 BCA ¶ 35,832 at 175,230 (an unsupported claim document that is submitted by a party seeking money is not proof of the claim that the party asserts). The travel costs are documented with expense records (app. supp. R4, tabs 26, 26a). However, those expenses are unrecoverable without adequate documentation to support recovery of the SSC consulting charge.

FDD claims $9,383.19 for "Unavoidable office exp[enses]" (app. br. at 29, item 12). This is supported by five pages listing lease, phone and utility payments (app. supp. R4, tab 21a). The payments cover between August 2013 and February 2015 (app. supp. R4, tabs 21-24). There is no supporting documentation for the listed charges. Nor does FDD provide an explanation how these indirect charges are allocated to the purchase order. There is insufficient information to ascertain how these charges are recoverable as fair compensation to FDD for the nine days in which performance was authorized on the purchase order. *SWR*, 15-1 BCA ¶ 35,832 at 175,230 (an unsupported claim document that is submitted by a party seeking money is not proof of the claim that the party asserts).

22

FDD's last claim item is for $100 for flooring samples it provided to the KAB as part of its bid (app. br. at 29, item L). Such pre-contract costs that are incurred pursuant to competitive bidding are costs of doing business and belong in overhead or G&A pools. *Orbas & Associates*, ASBCA No. 50467, 97-2 BCA ¶ 29,107 at 144,851. FDD's overhead expenses are not recorded in a standard record keeping system. Although a tile sample was delivered, it was unnecessary. In Mr. Pierce's pursuit of a location to which samples were to be sent, the contract specialist and the contracting officer, informed him that samples were not required. (R4, tabs 4, 5 at 2) This unnecessary bid preparation expense is not recoverable as a cost resulting from the termination of the purchase order.

## CONCLUSION

Appellant has failed to prove recoverable costs in accordance with the terms of the termination for convenience provision of its contract. Appellant's appeal is denied.

Dated: November 13, 2018

DONALD E. KINNER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60049, Appeal of First Division Design, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
